**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DANIEL PENREE and D-M.W.,**
**a minor child, by Daniel Penree,**
**his father,**

                                    **Plaintiffs,**

        **vs.**                                              **6:13-cv-01323**
                                                             **(MAD/ATB)**

**CITY OF UTICA, NEW YORK;**
**CITY OF UTICA POLICE DEPARTMENT**
**CHIEF OF POLICE, MARK WILLIAMS;**
**CITY OF UTICA POLICE SERGEANT**
**WATSON; CITY OF UTICA POLICE**
**OFFICER CICCONE; CITY OF UTICA**
**POLICE OFFICER SKABINSKI;**
**JOHN DOES and JANE DOES, whose**
**identities are yet to be ascertained, and**
**who are members of the City of Utica**
**Police Department as Officers,**

_____
                                    **Defendants.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

**DEEP LAW OFFICE**                        **NORMAN P. DEEP, ESQ.**
6599 Martin Street
Rome, New York 13440
Attorney for Plaintiff Daniel Penree

**THE CHILDREN'S RIGHTS**                  **A.J. BOSMAN, ESQ.**
**INITIATIVE, INC.**
6599 Martin Street
Rome, New York 13440
Attorneys for Plaintiff D-M.W.

**CITY OF UTICA CORPORATION**              **ZACHARY C. OREN, ESQ.**
**COUNSEL**                                **MARK C. CURLEY, ESQ.**
1 Kennedy Plaza, 2nd Floor                 **MERIMA SMAJIC, ESQ.**
Utica, New York 13502
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I. INTRODUCTION

On October 23, 2013, Daniel Penree and D-M.W. ("Plaintiffs") commenced this action pursuant to 42 U.S.C. § 1983 and New York law. *See* Dkt. No. 1. On June 23, 2014, Plaintiffs filed an amended complaint. *See* Dkt. No. 19. In the amended complaint, Plaintiffs assert claims for excessive force, failure to intervene, and failure to train, supervise, or discipline in violation of the United States Constitution (the "Constitution"). Additionally, Plaintiff Penree asserts claims for false arrest, illegal search, and malicious prosecution in violation of the Constitution. *See id.* Plaintiffs also assert claims under New York law for negligence, gross negligence, and assault and battery, and Plaintiff Penree asserts claims under New York law for malicious prosecution and false arrest. *See id.* Presently before the Court is Defendants' summary judgment motion pursuant to Rule 56 of the Federal Rules of Civil Procedure, seeking dismissal of this action against them. *See* Dkt. No. 37.

## II. BACKGROUND

Plaintiff Penree is the property owner of the residence located at 1673 Nielson Street in the City of Utica. *See* Dkt. No. 37-6 at 13. In April 2012, he resided there with his two minor children, including infant Plaintiff D-M.W. *See id.* at 13. Plaintiff has not ever kept any firearms in his house.[1] *See id.* at 15. Danielle Williams is the mother of Plaintiff Penree's children. *See id.* at 17. Plaintiff Penree and Danielle Williams had a domestic incident on April 22, 2012, which involved Danielle Williams leaving Plaintiff Penree's residence with their children in the early hours of that morning. *See* Dkt. No. 41-3. Plaintiff Penree called the police when he awoke and found that his children were not present in his home. *See* Dkt. No. 37-6 at 16-17. Plaintiff

---

[1] Unless otherwise indicated, facts are presented in the light most favorable to Plaintiffs.

Penree's concern was that Danielle Williams was intoxicated four hours earlier, and she left the residence with the children some time during those early morning hours. *See id.* The police were able to assist Plaintiff Penree in locating his children at the residence of Danielle Williams' parents. *See id.* at 18.

The responding police officers described their interaction that day in the incident reports. *See* Dkt. Nos. 41-2; 41-3. Officer Dzenan Sabanovic responded to Plaintiff Penree's call reporting that Danielle Williams had endangered his children. *See* Dkt. No. 41-2 at 2. Officer Sabanovic stated that he did not have probable cause to call child protective services ("CPS") but that he would check on the children. *See id.* When he arrived at the Williams' residence, he was confronted by Williams who told him to "get the fuck out of here." *See id.*

He left and returned less than an hour later, and he observed Plaintiff Penree exit his vehicle. *See id.* Plaintiff Penree advised Officer Sabanovic that he wanted to get his children back, and they went together to the front door. *See id.* When Danielle Williams came to the door, an argument ensued and culminated in Danielle Williams' mother, Kim Williams, getting a large hammer and raising it above her head like she was going to swing it at them. *See id.* Plaintiff Penree became irate, and Officer Sabanovic repeatedly ordered Kim Williams to drop the hammer, but she refused. *See id.* Eventually, the door was closed and Plaintiff Penree walked away and, according to the report, said "I will fucking kill all of you" before driving away. *See id.* As a result, both Kim Williams and Plaintiff Penree were charged with obstructing governmental administration. *See id.* at 3.

The last police interaction that day was described by Utica police officer Adam Howe in a separate incident report, and the narrative report was reviewed and electronically signed by Defendant Lieutenant James Watson ("Defendant Watson") on April 22, 2012. *See* Dkt. No. 41-

3. According to that report, Officer Howe arrived at the Williams' residence at about the same time that Plaintiff Penree arrived. *See id.* Plaintiff Penree asked for police assistance in delivering several items of clothing, a cell phone, and some infant formula to Danielle Williams and his children at her parents' residence. *See id.* Officer Howe delivered the items to Danielle Williams. *See id.* That was the fifth time the Utica Police Department was called on April 22, 2012 regarding "the ongoing dispute between Penree and Williams." *See id.*

The following day, April 23, 2012, Danielle Williams returned to Plaintiff Penree's residence to bring the children to him. *See* Dkt. No. 41-4. According to Plaintiff Penree, he asked Danielle Williams to leave his residence, and she reacted with violence towards him. *See* Dkt. No. 37-6 at 28. When Danielle Williams continued to be physically aggressive, he physically removed her from his home and took the key to his house from her. *See* Dkt. No. 37-6 at 29-30. He then called 9-1-1 and reported that the mother of his children had attacked him in front of his children. *See* Dkt. No. 45-1 at 39. The police records indicate that they were advised that there were no weapons or alcohol in the house. *See* Dkt. No. 37-3 at 17.

Plaintiff Penree advised the responding police officers that Danielle Williams came after him again in front of his kids. *See id.* at 41. The police officers who initially arrived at Plaintiff Penree's residence are Defendants Joshua Skibinski[2] ("Defendant Skibinski") and Titus Ciccone ("Defendant Ciccone"). *See* Dkt. No. 45-1 at 8. Plaintiff Penree advised them that he had visitation with his kids at that time and had documentation to prove it. *See id.* at 8, 41. He told the officers that the kids were safe, and he asked them to have Danielle Williams removed from his property. *See id.* at 41.

---

[2] Although the caption names City of Utica Police Officer Skabiniski, the correct spelling is "Skibinski."

When Defendants Skibinski and Ciccone arrived at the residence, they observed Danielle Williams standing in front of the house on the sidewalk. *See* Dkt. Nos. 41-4; 45-1 at 9. Danielle Williams was known to Defendant Skibinski from previous police interactions. *See* Dkt. No. 45-1 at 9. She complained that she had gotten into a physical altercation with Plaintiff Penree that ended with him on top of her. *See id.* at 10. This altercation was witnessed by Plaintiff D-M.W. *See id.* Danielle Williams described that Plaintiff Penree pushed her out the front door which led to her falling down the stairs. *See* Dkt. No. 41-4.

Defendants Skibinski and Ciccone approached Plaintiff Penree while he was standing on his front porch and asked if they could enter his home. *See* Dkt. No. 41-4 at 3. Plaintiff Penree denied their request to enter the home but spoke with the officers from his porch. *See id.* Defendant Skibiniski asked to see the children to ensure that they were "ok." *See id.* Plaintiff Penree again would not allow the officers to enter his home, but he brought the children out onto the porch so that they could be observed. *See id.* Defendant Skibiniski records in his report that the children "appeared ok." *See id.* Defendant Skibinski observed that the children were not crying, and Plaintiff Penree claims that Defendant Skibinski said "they look good to me." *See id.* at 42-43. Plaintiff Penree then went back into his house with the children, and the officers returned to their car. *See* Dkt. Nos. 37-6 at 36; 45-1 at 42-43.

Defendant Skibinski testified that he did not act when the children were outside on the porch of the house because he did not have any reasonable basis to do so. *See* Dkt. No. 45-1 at 23. Further, Defendant Skibinski stated that if the children had not been in the house, the police would not have entered Plaintiff Penree's residence without a warrant. *See id.* at 19. Defendant Skibiniski articulated that his decision to enter the home to make an arrest on April 23, 2012 was because the police "were concerned for the welfare of the children." *See* Dkt. No. 45-1 at 18.

Specifically, Defendant Skibinski explained that the police did not know "what the conditions were in the home, there's no way to - - who knows if stuff got broken while [Plaintiff Penree and Danielle Williams] were fighting. There could be glass on the floor or he may not have food there for them. They might not have clothes and stuff." *See id.* at 18. The police officers did not attempt to get a warrant to arrest Plaintiff and they did not attempt to call child protective services at any time on April 23, 2012,. *See id.* at 34.

According to Plaintiff Penree, the officers left the area of his front door for approximately thirty to forty-five minutes, and, in that time, he was able to put his youngest child down for a nap. *See* Dkt. Nos. 45-1 at 47; 37-6 at 36. During that time, Defendant Skibinski prepared a written complaint for harassment in the second degree, which was reviewed and signed by Danielle Williams. *See* Dkt. No. 41-4 at 3. It was also during this time that Defendant James Watson, a sergeant with the City of Utica Police Department, arrived on the scene. *See* Dkt. Nos. 37-3 at 9; 37-7 at 6-8. Defendant Watson spoke with Defendants Ciccone and Skibinski as well as Danielle Williams about the situation. *See* Dkt. Nos. 37-3 at 9; 37-7 at 9-10. Defendant Skibinski informed Defendant Watson that he had seen the children and that they looked "ok." *See* Dkt. No. 37-7 at 12. The on-scene officers also told Defendant Watson that they were concerned for the children because they felt "[Plaintiff Penree's] mental state maybe wasn't such that he would be able to take care of children at that point." *See id.* at 12. Defendant Watson testified that he had the right to enter into Plaintiff Penree's home because he believed that Plaintiff Penree was under arrest for harassment in the second degree against Danielle Williams. *See id.* at 23.

Danielle Williams did not ever represent to the police officers that the house was her residence. *See* Dkt. No. 45-1 at 25. According to the police report, Danielle Williams did advise

6

that she had an additional key to Plaintiff Penree's home, and her father, Terry Williams, arrived on the scene with that key to the house. *See* Dkt. No.41-4 at 3. Plaintiff Penree heard people coming up the outside stairs to his enclosed mud room and observed Defendant Watson and Terry Williams standing in front of his door with the house key. *See* Dkt. No. 37-6 at 40. Plaintiff Penree yelled out that they were not permitted to enter his house, and he dead bolted the lock to the interior door of the mud room. *See id.* at 40-41.

Plaintiff Penree observed that Defendant Watson and Terry Williams were attempting to open the lock of the interior mud room door that led to the interior of his home. *See id.* at 41. Defendant Watson stated that, while standing inside Plaintiff Penree's mud room, he used the key to attempt to unlock the interior door of that room but he was unsuccessful because Plaintiff Penree "made it back to the door." *See* Dkt. No. 37-3 at 10. Defendant Watson continued to asked Plaintiff Penree to open his door so that they could talk with him, and Plaintiff Penree continued to decline to open the door. *See id.* at 42. The police officers continued in this manner for an additional period of time. *See id.* According to the police reports, it was one hour from the time that Defendants Skibinski and Ciccone first responded to Plaintiff Penree's 9-1-1 call until the time that Defendants Skibinski, Ciccone, and Watson arrested him. *See* Dkt. Nos. 37-3 at 4; 41-4; 41-8. Plaintiff Penree was advised that he was not under arrest, and he asked that everyone leave his property. *See* Dkt. No. 37-6 at 43. He felt threatened at this time. *See id.*

Defendants Skibinski, Ciccone, and Watson again entered the enclosed mud room with Danielle Williams and further requested that Plaintiff Penree provide some of her belongings from inside the house. *See* Dkt. No. 41-4 at 3. After Plaintiff Penree refused, the officers had Danielle Williams leave the enclosed mud room while they continued to speak with Plaintiff Penree through the windowed door. *See id.* Eventually, they convinced him to provide some

belongings that he would pass through the door. *See id.* Defendants Skibinski, Ciccone, and Watson had contrived this plan to induce Plaintiff Penree into opening the door so that Danielle Williams could make a citizen's arrest. *See* Dkt. No. 45-1 at 16, 26.

While Plaintiff Penree was collecting some of Danielle Williams belongings, Defendants Skibinski, Ciccone, and Watson had her enter the enclosed mud room again so that when the door opened, she could place Plaintiff Penree under a citizen's arrest. *See* Dkt. No. 41-4 at 3. While Defendants were standing inside the mud room, Defendant Skibinski asked Danielle Williams if there were any fire arms in the house, and she responded that "he used to but she didn't know if he still did." *See id.* Before the door was opened, Plaintiff Penree confirmed that he was not under arrest and advised the officers that he was holding Plaintiff D-M.W. *See* Dkt. No. 37-6 at 44. When Plaintiff Penree cracked open his front door, Defendants Skibinski, Watson, and Ciccone forced the door open and further entered Plaintiff Penree's residence. *See* Dkt. Nos. 37-6 at 45; 45-1 at 46. At that point in time, none of the officers said that he was under arrest. *See* Dkt. No. 45-1 at 27-28.

As Defendants were "slamming" the door open, Plaintiff Penree turned and went upstairs to his bedroom with Plaintiff D-M.W. *See* Dkt. No. 37-6 at 45. Defendants proceeded up the stairs after them, and Plaintiff Penree shut his bedroom door and attempted to barricade himself in with his body. *See id.* at 47. Defendants were pushing on the bedroom door and, when Plaintiff Penree heard the door start to break, he feared for his child's safety and moved away from the door. *See id.* Defendants Watson, Skibinski, and Ciccone then entered into the bedroom and deployed taser darts into Plaintiff Penree's back while he was holding Plaintiff D-M.W. *See* Dkt. Nos. 37-6 at 48-49; 41-4 at 3. Both Plaintiffs fell to the ground and Plaintiff D-M.W. sustained a head injury. *See id.* at 49-75.

Plaintiff Penree claims that he was not ever told that he was under arrest prior to being handcuffed. *See* Dkt. No. 37-6 at 48. Defendants do not dispute that they were aware Plaintiff Penree was holding the toddler when they entered the bedroom. *See* Dkt. No. 41-4 at 3. According to the police report, Defendants Watson, Skibinski, and Ciccone discussed the use of force just prior to forcibly pushing further into Plaintiff Penree's residence, and they had decided that, if necessary, the taser was preferable to pepper spray. *See* Dkt. No. 37-3 at 9. Plaintiff D-M.W.'s head injury is depicted in photographs. *See* Dkt. No. 37-12 at 2-4. Defendant Watson picked up Plaintiff D-M.W. from the floor, and Plaintiff Penree was then handcuffed by Defendants Ciccone and Watson. *See* Dkt. Nos. 37-3 at 10; 37-6 at 51.

Plaintiff Penree was transported to the police station and complained that the handcuffs were too tight. *See* Dkt. No. 37-6 at 52. Plaintiff Penree was examined by an emergency medical person from the fire department, and Defendant Skibinski prepared and filed the criminal complaint. *See* Dkt. Nos. 37-3 at 15; 41-4 at 3; 41-8. Plaintiff was charged with (1) harassment in the second degree in violation of New York Penal Law § 240.26(1) based upon the complaint filed by Danielle Williams; (2) harassment in the second degree in violation of New York Penal Law § 240.26(1) based upon the complaint filed by Defendant Skibinski; (3) endangering the welfare of a child in violation of New York Penal Law § 260.10(1) based upon Plaintiff Penree's attempt to push the door closed on Defendants and his run up the stairs while holding Plaintiff D-M.W.; and (4) resisting arrest in violation of New York Penal Law § 205.30. *See* Dkt. Nos. 37-3; 41-7; 41-8. As a result, an order of protection was issued against Plaintiff Penree ordering him to stay away. *See* Dkt. No. 37-3 at 15. Plaintiff Penree was released on bail that same evening. *See* Dkt. No. 37-3 at 12. On June 15, 2012, Danielle Williams had a dispute with the police

department and advised them that she was no longer willing to come to court. *See* Dkt. No. 37-3 at 15.

On November 29, 2012, a *Payton* hearing was conducted, *see* Dkt. No. 45-1 at 1-63, and, on November 22, 2013, a city court judge dismissed all the criminal charges against Plaintiff Penree finding that no exigent circumstances existed that would have allowed the warrantless arrest of Plaintiff Penree in his home, *see* Dkt. No. 41-10. The city court judge also found that in thirty to forty-five minutes, the police would have been able to obtain an arrest warrant. *See id.*

On October 23, 2013, Plaintiffs commenced this action alleging violations of their constitutional rights as well as state tort claims. *See* Dkt. No. 1. An amended complaint was filed on June 23, 2014. *See* Dkt. No. 19. Defendants appeared in this action and, pursuant to Rule 56 of the Federal Rules of Civil Procedure, have moved for summary judgment dismissing the amended complaint. *See* Dkt. Nos. 12; 21; 37. For the reasons set forth, Defendants motion is granted in part and denied in part.

### III. DISCUSSION

**A.    Legal Standard**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the undisputed facts warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). "The moving party bears the burden of showing that he or she is entitled to summary judgment." *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2004); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party must identify those portions of the record which demonstrate that there is no genuine issue of material fact. *See Celotex*, 477 U.S. at 323. When analyzing a summary judgment motion, the court "cannot try

issues of fact; it can only determine whether there are issues to be tried." *Chambers*, 43 F.3d at 36-37 (quotation marks and other citation omitted).

Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex*, 477 U.S. at 324 (citing Fed. R. Civ. P. 56(c), (e)). In assessing whether any such issues of material fact exist within the record, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted).

## B. State Tort Claims

Plaintiff Penree alleges a state law claim for false arrest based on his claim that Defendants Watson, Ciccone, and Skibinski arrested him without a warrant and without probable cause, detained him, and transported him against his will. *See* Dkt. No. 19 at ¶¶ 65-66. Plaintiff Penree's eighth cause of action is for malicious prosecution under state law. *See id.* at ¶¶ 75-79. Plaintiffs allege assault claims against Defendants Watson, Ciccone, and Skibinski claiming that Defendants placed them in immediate apprehension of imminent harmful or offensive contact without privilege. *See id.* at ¶¶ 56-58. Plaintiffs also allege that Defendants unlawfully, intentionally, and recklessly touched and battered the Plaintiffs. *See id.* Plaintiffs maintain that Defendant City of Utica and Defendant Police Chief Williams were negligent and, in turn, their negligence caused the offending conduct of Defendants Watson, Ciccone, and Skibinski. *See id.* at ¶¶ 61-63.

Federal courts apply state statutes of limitations to state law claims, *see Vincent v. Money Store*, 915 F. Supp. 2d 553, 560-61 (S.D.N.Y. 2013) (stating that it makes no difference if the state law claims are presented in federal court based on diversity jurisdiction or supplemental

jurisdiction), and apply state notice of claim statutes to state law claims as well. *See Reyes v. City of New York*, 992 F. Supp. 2d 290, 300 (S.D.N.Y. 2014) (quoting *Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999)). The Second Circuit has stated that New York's General Municipal Law controls when a plaintiff sues a city for tortious conduct, and it also controls those claims against any employee of a city "if the municipality is required to indemnify the defendant pursuant to the General Municipal Law or any other statutory provision and is therefore 'the real party in interest.'" *Conte v. Cty. of Nassau*, 596 Fed. Appx. 1, 5 (2d Cir. 2014) (quoting *Ruggiero v. Phillips*, 292 A.D.2d 41 (4th Dep't 2002)). General Municipal Law § 50-j provides that a city is "liable for . . . any duly appointed police officer of such municipality, authority or agency for any negligent act or tort, provided such police officer, at the time of the negligent act or tort complained of, was acting in the performance of his duties and within the scope of his employment." *See also LaGrange v. Ryan*, 142 F. Supp. 2d 287, 295 (N.D.N.Y. 2001) (stating that notice of claim requirements are not limited to just negligence claims but must also be served for "intentional tort actions against police officers."). Defendants have admitted that the individually named officers were employees of the City of Utica. *See* Dkt. Nos. 19 at ¶ 5; 21 at ¶ at 1.

The statute of limitations for any state claims for tortious conduct, including false arrest/false imprisonment, malicious prosecution, negligence, gross negligence, assault, and battery against Defendants is one year and ninety days pursuant to New York General Municipal Law § 50-i. In this case, the alleged conduct of negligence, gross negligence, assault, and battery took place on April 23, 2012, and, therefore, the statute of limitations on Plaintiff Penree's state law personal injury claims expired on July 22, 2013, which is three months before Plaintiffs commenced this action. *See* Dkt. Nos. 1, 19. The Court dismisses Plaintiff Penree's fourth and

fifth causes of action for negligence, gross negligence, assault, and battery as barred by the statute of limitations.

Plaintiff Penree was arrested and brought to the Utica Police Department where the charges were filed against him. *See* Dkt. Nos. 37-6 at 54; 41-7. Some time later, Plaintiff Penree was able to post bail and was released from police custody on April 23, 2012. *See* Dkt. No. 41-7 at 54, 57. The time limitations of General Municipal Law § 50-i also controls the state tort of false imprisonment/false arrest, which is an intentional tort under state law. *See Peresluha v. City of New York*, 60 A.D.2d 226, 229 (1st Dep't 1977); *see also Rosado v. City of New York*, 713 F. Supp. 124, 126 (S.D.N.Y. 1989) (listing the claim of false imprisonment as an intentional tort). Having been arrested and released from custody on April 23, 2012, Plaintiff Penree had until July 22, 2013 to commence an action under state law for false arrest/false imprisonment, and he did not file his complaint until October 23, 2013. The Court dismisses Plaintiff Penree's state claim for false arrest/false imprisonment because it is also barred by the statute of limitations.

However, Plaintiff D-M.W.'s claims for negligence, gross negligence, assault, and battery are not barred by the one year and ninety day statute of limitations because D-M.W.'s status as an infant tolls the time limitation. *See Cohen v. Pearl River Union Free Sch. Dist.*, 51 N.Y.2d 256, 262-63 (1980). In addition, Plaintiff D-M.W.'s time to serve a late notice of claim is likewise tolled for infancy. *See id.* at 263. Therefore, the Court will address the substance of Plaintiff D-M.W.'s negligence, assault, and battery claims. When negligence is claimed against a municipality, it is necessary to determine "whether the municipal entity was engaged in a proprietary function or acted in a governmental capacity at the time the claim arose." *Applewhite v. Accuhealth, Inc.*, 21 N.Y.3d 420, 425 (2013). A proprietary function is being carried out when the municipality's "'activities essentially substitute for or supplement traditionally private

enterprises.'" *Id.* (quoting *Sebastian v. State*, 93 N.Y.2d 790, 793 (1999)).  If the municipal

function is proprietary, then the municipality is subject to the ordinary rules of negligence that are

applicable to non-governmental parties.  *See id.*

If the governmental entity was acting in a governmental capacity, meaning that "its acts

are 'undertaken for the protection and safety of the public pursuant to the general police powers,'"

then the plaintiff must show that he or she was owed a "special duty."  *Id.* (quoting *Sebastian*, 93

N.Y.2d at 793); *see also Velez v. City of New York*, 730 F.3d 128, 135 (2d Cir. 2013).  Actions

taken "for the protection and safety of the public pursuant to the general police powers" are

governmental functions.  *Velez*, 730 F.3d at 134-35.  The New York Court of Appeals stated that

"[p]olice and fire protection are examples of long-recognized, quintessential governmental

functions."  *Applewhite*, 21 N.Y.3d at 425 (citing *Valdez v. City of New York*, 18 N.Y.3d 69, 75

(2011)).

Here, the alleged negligence of Defendant City of Utica and Defendant Williams was

taken pursuant to their general police powers, and, therefore, Plaintiff D-M.W. must prove that a

special relationship existed between the minor and Defendants City of Utica and Williams.  *See*

*Velez*, 730 F.3d at 135 ("The core principle is that to sustain liability against a municipality, the

duty breached must be more than that owed the public generally") (internal quotation marks and

citations omitted).  A "special relationship" requires four elements to be present, which are:

> (1) an assumption by the municipality, through promises or actions,
> of an affirmative duty to act on behalf of the party who was injured;
> (2) knowledge on the part of the municipality's agents that inaction
> could lead to harm; (3) some form of direct contact between the
> municipality's agents and the injured party; and (4) that party's
> justifiable reliance on the municipality's affirmative undertaking.

*Velez*, 730 F.3d at 135. Plaintiff D-M.W. has failed to establish that any of these elements were present, and, without meeting that burden, Plaintiff D-M.W.'s claims for negligence fail. The Court dismisses Plaintiff D-M.W.'s claims for negligence.

Plaintiff D-M.W. also maintains state claims for assault and battery. *See* Dkt. No. 19 at ¶¶ 56-59. Under New York law, assault is "the intentional placing of another in apprehension of imminent harmful or offensive contact," and battery is "(1) bodily contact, which is (2) harmful or offensive in nature, and (3) made with intent." *Merzon v. Cty. of Suffolk*, 767 F. Supp. 432, 448 (E.D.N.Y. 1991). In this case, Plaintiff D-M.W. was being held in his father's arms at the time of the alleged assault and battery. *See* Dkt. No. 37-3 at 10-11, 14. The fact that Defendants Watson, Ciccone, and Skibinski did not act with the specific intent to put Plaintiff D-M.W. in apprehension of either a harmful or offensive bodily contact, or did not act with the specific intent to cause harmful or offensive bodily contact to him, is not fatal to Plaintiff D-M.W.'s claims. Plaintiff D-M.W.'s allegations that these Defendants acted with the requisite intent toward Plaintiff Penree is sufficient to withstand dismissal of his or her claims for assault and battery. *See Parler v. North Ins. Co.*, 129 A.D.3d 926, 928 (2d Dep't 2015) (stating that "the fact that the bar stool made physical contact with [the plaintiff] and not the intended target does not negate the conclusion that the act was done with the intention to commit an assault or a battery."); *Jones v. State*, 96 A.D.2d 105, 110-11 (4th Dep't 1983) (stating that the defendants do not escape liability because the intent was to injure someone else but the plaintiff was unintentionally struck). The Court denies Defendants' motion for summary judgment on Plaintiff D-M.W.'s assault and battery claims.

**C.      Fourth Amendment Claims**

Plaintiff Penree claims that Defendants Watson, Ciccone, and Skibinski restrained him against his will without probable cause and without a warrant, and Defendants "arrested, detained and transported" him against his will. *See* Dkt. No. 19 at ¶¶ 65-66. According to Plaintiff Penree, the entrance into his home by Defendants Watson, Ciccone, and Skibinski was an unreasonable search and seizure in violation of his constitutional rights. *See id.* at ¶¶ 67-68. Plaintiffs also contend the use of force by Defendants prior to and during Plaintiff Penree's arrest was excessive and objectively unreasonable in violation of Plaintiff Penree's Fourth Amendment rights. *See id.* at ¶¶ 31-36. Finally, Plaintiff Penree's seventh cause of action alleges that Defendants maliciously prosecuted him in violation of the Fourth Amendment.[3] *See id.* at ¶¶ 69-73.

The Fourth Amendment of the United States Constitution (the "Fourth Amendment") provides that

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The Supreme Court in *Payton v. New York*, 445 U.S. 573, 585 (1980), stated that "[u]reasonable searches or seizures conducted without any warrant at all are condemned by the plain language of the first clause of the Amendment." The warrantless arrest of a person is a seizure, which the Fourth Amendment requires to be reasonable. *See id.* at 585. Further, the "'physical entry of the home is the chief evil against which the working of the Fourth Amendment is directed.'" *Id.* (quoting *United States v. United States Dis. Court*, 407 U.S. 297, 313 (1972)). A

---

[3] Plaintiffs also maintain claims against Defendants Watson, Ciccone, and Skibinski for failure to intervene and prevent the harm caused by the unconstitutional acts of another police officer. *See* Dkt. No. 19 at ¶¶ 37-42. Defendants have not move for summary judgment on this claim.

warrantless arrest within the home implicates not only the "invasion attendant to all arrests but also an invasion of the sanctity of the home." *United States v. Reed*, 572 F.2d 412, 423 (2d Cir. 1978).

The Fourth Amendment's prohibitions against unreasonable seizures applies equally to how an arrest is carried out, and, therefore, "*all* claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). Also, the Fourth Amendment provides the basis for a Section 1983 claim that alleges malicious prosecution. *See Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 115 (2d Cir. 1995) (citing *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (concluding that claims for malicious prosecution are analyzed under the Fourth Amendment and not substantive due process of the Fourteenth Amendment)).

### 1. False Arrest

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, . . . is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (internal citations omitted). A Section 1983 claim for false arrest/false imprisonment (collectively "false arrest") is analyzed under the law of the state where the arrest occurred. *See Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006). "Under New York law, false arrest is considered to be a species of false imprisonment, and the two claims have identical elements." *Mejia v. City of New York*, 119 F. Supp. 2d 232, 252 (E.D.N.Y. 2000) (citing *Singer,* 63 F.3d at 118).

The elements for a Section 1983 claim for false arrest are as follows: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Singer*, 63 F.3d at 118 (citing *Broughton v. State*, 37 N.Y.2d 451, 456 (1975)); *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994).

A warrantless arrest, as was the case here, is "presumptively unlawful." *See Raysor v. Port Auth.*, 768 F.2d 34, 40 (2d Cir. 1985) (stating that "the plaintiff need not prove either malice or want of probable cause"); *see also Jenkins v. City of New York*, 478 F.3d 76, 88 (2d Cir. 2007). However, "[t]here can be no federal civil rights claim for false arrest where the arresting officer had probable cause." *Singer*, 63 F.3d at 118 (citing *Bernard*, 25 F.3d at 102). Accordingly, the presumption that a warrantless arrest is unlawful can be rebutted by the defendant if it is established that there was probable cause for the arrest. *See Jenkins*, 478 F.3d at 88. The existence of probable cause is a complete defense, for which the defendant bears the burden of proof. *See Dickerson v. Napolitano*, 604 F.3d 732, 751 (2d Cir. 2010); *Weyant*, 101 F.3d at 852 (citing *Bernard*, 25 F.3d at 102).

There is "probable cause to arrest . . . when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant*, 101 F.3d at 852 (citations omitted). The standard is "a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *United States v. Delossantos*, 536 F.3d 155, 159 (2d Cir. 2008) (internal quotation marks omitted) (quoting *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (stating that probable cause protects "'citizens from rash and unreasonable

interferences with privacy and from unfounded charges of crime'" (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)).

"[T]he probable cause inquiry is based upon whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." *Jaegly*, 439 F.3d at 153 (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)). The significance of those facts can be "enhanced" or "diminished" by the surrounding circumstances of the arrest, *see Jenkins*, 478 F.3d at 90, because the standard is fluid and contextual, *see Delossantos*, 536 F.3d at 159. The circumstances "must be considered from the perspective of a reasonable police officer in light of his training and experience." *Id.*

In determining whether there was probable cause for the arrest, the Court's analysis is not limited to the offense invoked by the arresting officer or the crimes that are ultimately charged, but, instead, probable cause "'depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.'" *Jaegly*, 439 F.3d at 153-54 (quoting *Devenpeck*, 543 U.S. at 152-53). Accordingly, the Court must focus on the "validity of the *arrest*, and not on the validity of each charge." *Id.* at 154. Whether there was probable cause is a question that can be determined as a matter of law on summary judgment "if there is no dispute as to the pertinent events and the knowledge of the officers." *Weyant*, 101 F.3d at 852; *see also Jenkins*, 478 F.3d at 88. Summary judgment should be granted in favor of the defendants where the facts, construed in favor of the plaintiff, establish that the officer's probable cause determination was objectively reasonable. *See Jenkins*, 478 F.3d at 88.

In the present case, Defendants Watson, Skibinski, and Ciccone entered into Plaintiff Penree's home with the stated intention to attempt to take Plaintiff Penree into custody based upon Danielle Williams' complaint for harassment in the second degree. *See* Dkt. Nos. 37-7 at 30; 45-1

at 18.  Defendants Watson, Ciccone, and Skibinski were attempting to coerce Plaintiff Penree out of his home under the false pretenses of asking for some of Danielle Williams' belongings.  *See* Dkt. No. 45-1 at 26.  Their plan was to have Danielle Williams tell Plaintiff Penree that he was under citizen's arrest when he opened the interior door of his mud room.  *See* Dkt. Nos. 37-3 at 14; 37-7 at 23, 30; 45-1 at 16.  When Plaintiff Penree cracked open the door, Defendants claim that Danielle Williams said he was under arrest.  *See* Dkt. No. 37-3 at 11.  None of the officers said that he was under arrest.  *See* Dkt. No. 54-1 at 27-28.

The only argument made by Defendants in their motion for summary judgment is that Defendants had probable cause to arrest Plaintiff Penree for harassment in the second degree based on Danielle Williams' written complaint together with the red marks on her legs, the absence of marks on Plaintiff Penree's arms, and an alleged threat that Plaintiff Penree made the day before "arguably" toward Danielle Williams.  *See* Dkt. No. 37-23 at 18-20.[4]  "An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest *absent* circumstances that raise doubts as to the victim's veracity."  *Singer*, 63 F.3d at 119 (emphasis added); *see also Breitbard v. Mitchell*, 390 F. Supp. 2d 237, 245 (E.D.N.Y. 2005).  Probable cause should be found to exist even if the information is incorrect, so long as the reliance was reasonable.  *See Bernard*, 25 F.3d at 103.

Here, Danielle Williams claimed to be the victim of a statutory violation, so the Court's inquiry is "whether there were 'circumstances that raise[d] doubts'" as to her veracity.  *Rae v. Cty. of Suffolk*, 693 F. Supp. 2d 217, 224 (E.D.N.Y. 2010) (quoting *Singer*, 63 F.3d at 119).  To begin

---

[4] Defendants do not raise any argument that there was probable cause to arrest related to any other violation or crime.  *See* Dkt. No. 37-23 at 19-20.  Also, Defendants have not proceeded with the theory that Plaintiff Penree was under a citizen's arrest.  *See id.*

with, Defendants admit that they were familiar with Plaintiff Penree and Danielle Williams due to repeated domestic incidents requiring police intervention. *See* Dkt. Nos. 37-3 at 9; 45-1 at 11. The previous domestic incidents listed on the Utica Police Department's records, submitted by Defendants, indicate that Plaintiff Penree had multiple domestic incidents prior to April 23, 2012 where the "caller" reported harassment and other domestic disputes against Plaintiff Penree that were determined to be unfounded by the responding police officers. *See* Dkt. No. 37-5 at 5-7. Those same records indicate that Plaintiff Penree was the *victim* of harassment and other domestic disputes. *See id.* The police record is so replete with these incidents that an overall familiarity with the domestic disputes between Danielle Williams and Plaintiff Penree would indicate to a reasonable officer that Danielle Williams was an unreliable witness.

Also, Danielle Williams' version of the domestic dispute with Plaintiff Penree, as described in the complaint, was vague as to her own violent behavior. *See* Dkt. No. 41-4 at 3. She told Defendant Skibinski that she was arguing with Plaintiff Penree and "they had a physical altercation which lead [sic] to her being on the floor with Dan on top of her." *See* Dkt. No. 45-1 at 10. Her version of events was disputed by Plaintiff Penree's statement to Defendants Skibinski and Ciccone. *See* Dkt. No. 41-4 at 3. Plaintiff Penree called the police and reported that he had been attacked in his home by the mother of his children. *See id.* at 40. When Defendants Skibinski and Ciccone responded, Plaintiff Penree told them Danielle Williams attacked him in front of the children and that he restrained her so that she could not strike him again. *See id.* at 41. He also advised Defendants that he wanted Danielle Williams removed from his property and that he had a custody order to show that he had visitation with his kids at that time. *See id.* While Defendant Watson testified that Plaintiff Penree did not use any foul language at him during their

conversations, Danielle Williams is described in the police report as hysterical. *See* Dkt. Nos. 37-3 at 13; 45-1 at 12.

Defendants were aware of Plaintiff Penree and Danielle Williams' domestic disputes on April 22, 2012 where Plaintiff Penree allegedly made a threat to "kill all of you." *See* Dkt. No. 37-3 at 14. The threat was made at the residence of Danielle Williams' parents after her mother retrieved a "large hammer" and threatened to strike Plaintiff Penree and the police officer. *See* Dkt. No. 41-2 at 2. Although the police report documents that Plaintiff Penree was charged with obstructing governmental administration, Plaintiff Penree was not charged with any violations or crimes related to the "threat." *See* Dkt. No. 41-2 at 2. On the evening of April 22, 2012, Defendant Watson reviewed the report related to the fifth and final domestic call from that day related to Plaintiff Penree and Danielle Williams where Plaintiff Penree asked for police assistance to deliver clothing, a cell phone, and infant formula to Danielle Williams. *See* Dkt. No. 41-3.

Defendants reliance on this proposed "threat" made the day before as a basis for probable cause to arrest Plaintiff Penree on an unrelated event is insufficient. Plaintiff Penree was not charged with any violations related to his statement. The Court notes that 'the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 415 (2d Cir. 1999) (internal quotations marks and citations omitted) (finding that there is no probable cause based on the plaintiff's statement to a police office that "One day you're going to get yours"). "As a result, provocative speech directed at police officers is protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Id.* (internal quotation marks and citations omitted) (quoting *Terminiello*

22

*v. Chicago*, 337 U.S. 1, 4 (1949) (stating that the meaning of a statement must be interpreted within the "context, tone, accompanying action, and a variety of other circumstances")). Here, where the police officer did not charge Plaintiff Penree with any violations for his statement, it is reasonable to believe that the officer did not find the statement to be a direct or immediate threat to him or anyone else. Accordingly, probable cause has not been established as a matter of law based upon Defendants' reliance on a statement made the day before as Plaintiff Penree was walking away from a contentious situation after being threatened with a hammer.

Plaintiff Penree argues his arrest was a violation of his Fourth Amendment rights because Defendants were not authorized under New York law to execute an arrest for a criminal violation that they did not witness. *See id.* at 7-11. Plaintiff Penree is correct that harassment in the second degree is a violation and that police officers are not authorized to make a warrantless arrest for a violation unless the offense takes place in his or her presence. *See* N.Y. CRIM. PROC. LAW § 140.10(1); N.Y. PENAL LAW §§ 10.00(3), 240.26. Under New York law, harassment in the second degree must take place in the officer's presence to provide probable cause to arrest. *See Ramos v. City of New York*, 298 Fed. Appx. 84, 86 (2d Cir. 2008).

However, "a violation of state law does not, *ipso facto*, offend federal law; the Constitution, in other words, is not concerned with the restrictions that New York chooses to place on its police officers." *Mikulec v. Town of Cheektowaga*, 909 F. Supp. 2d 214, 225 (W.D.N.Y. 2012) (citing *Virginia v. Moore*, 553 U.S. 164, 176 (2008)); *see also Hotaling v. LaPlante*, 167 F. Supp. 2d 517, 522 (N.D.N.Y. 2001) (stating that the Fourth Amendment does not require that a police officer "personally witness the conduct upon which he or she relies to establish the existence of probable cause"); *Picciano v. McLoughlin*, 723 F. Supp. 2d 491, 504

(N.D.N.Y. 2010) (finding that a violation of a New York statute does not mean that the arrest lacked probable cause under the Fourth Amendment).

Further, Plaintiff Penree argues that Defendants' actions constituted an unreasonable seizure under the Fourth Amendment because they waited outside his home and "devised a scheme" to induce Plaintiff Penree to open the door to his residence. *See* Dkt. No. 44 at 7-11. The use of trickery or deception by police officers does not necessarily violate a suspect's Fourth Amendment rights. *See United States v. Giraldo*, 743 F. Supp. 152, 154 (2d Cir. 1990) (citing *Lewis v. United States*, 385 U.S. 206 (1966)). Plaintiff Penree does not raise facts that implicate an unlawful coercion because his free choice was not compromised by Defendants' request for Ms. Williams' belongings, even if that request was deceptive. Also, the police are permitted to seize a suspect before entering or after leaving a residence. *See Steagald v. United States*, 451 U.S. 204, 221 (1981) (noting that the need to obtain a search warrant can be avoided by simply waiting for a suspect to leave a residence). Accordingly, the Court does not agree with Plaintiff Penree that the police action of waiting outside of his home or deceiving him violated his rights under the Fourth Amendment.

In any event, the Court finds that Defendants did not meet their burden in establishing that there was probable cause to arrest Plaintiff Penree for harassment in the second degree. Defendants did not show as a matter of law that Defendants Watson, Ciccone, and Skibinski had reasonably trustworthy information to believe that Plaintiff Penree committed a crime against Danielle Williams.

### 2. Unreasonable Search

The warrantless entry into a home is presumptively unreasonable under the Fourth Amendment. *See Welsh v. Wisconsin*, 466 U.S. 740, 749 (1984); *Payton*, 445 U.S. at 586. An

arrest within the home is "simply too substantial an invasion to allow without a warrant, at least in the absence of exigent circumstances . . . even when probable cause is clearly present." *Payton*, 445 U.S. at 589 (citations omitted) (explaining that "the warrant procedure minimizes the danger of needless intrusions" into the home). Absent exigent circumstances, the threshold to a home "may not reasonably be crossed without a warrant." *Id.* at 590. Even an invasion of a "fraction of an inch is too much to be tolerated." *See Loria v. Gorman*, 306 F.3d 1271, 1284 (2d Cir. 2002) (internal quotation marks omitted) (quoting *Kyllo v. United States*, 533 U.S. 27, 37 (2001)). Therefore, to make a lawful entry into a home, the Fourth Amendment requires that probable cause *plus* exigent circumstances exist in order to "overcome the presumption of unreasonableness that attaches to all warrantless home entries." *Welsh*, 466 U.S. at 750; *see also Loria*, 306 F.3d at 1283.

The Fourth Amendment protection accorded to the home includes the curtilage of the home, that is the "area to which extends the intimate activity associated with the sanctity of a [person's] home and the privacies of life." *United States v. Hayes*, 551 F.3d 138, 146 (2d Cir. 2008); *see also United States v. Dunn*, 480 U.S. 294, 300-01 (1987) (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)). In order to determine whether an area is included in the curtilage of a home and, thus, entitled to the same privacy protections as the home, the courts examine several factors, which are "(1) the area's proximity to the main residence; (2) any enclosure of the property or area; (3) use of the property or area; and (4) steps taken to protect the property or area from view." *Hayes*, 551 F.3d at 146.

The Second Circuit applies these factors and further evaluates curtilage with an objective question, "'whether society would recognize the particular area claimed as within the curtilage of the home,'" and a subjective question, "'whether the defendant has manifested a subjective

expectation of privacy in that area.'" *Hayes*, 551 F.3d at 146 (quoting *United States v. Titemore*, 437 F.3d 251, 258 (2d Cir. 2006)).  Without this further evaluation, a Fourth Amendment analysis is incomplete because "it is possible that an area might fall within the curtilage of the home, as that concept was defined at common law, but the owner or resident may fail to manifest a subjective expectation of privacy in that area." *Titemore*, 437 F.3d at 258.

Here, Defendants Watson, Skibinski, and Ciccone entered into an area, described by Plaintiff Penree as the mud room, which is attached to the home and completely enclosed by exterior walls and an exterior door with a lock.[5] *See* Dkt. Nos. 37-6 at 39; 37-11 at 6.  It is not disputed that initially the exterior door to the mud room was closed.  *See* Dkt. Nos. 37-3 at 9; 37-6 at 39.  Defendant Watson's report indicates that this door was locked, and he permitted Danielle Williams to open the exterior door with a key that one of her parents brought to the scene.  *See* Dkt. Nos. 37-3 at 9; 37-6 at 39.

Defendants Watson, Skibinski, and Ciccone reported that they entered into the enclosed area with Danielle Williams and "encountered another locked door."  *See* Dkt. Nos. 37-3 at 9; 37-7 at 21.  Defendant Watson permitted Danielle Williams to attempt to unlock the interior door, but Plaintiff Penree prevented her by "dead lock[ing]" that interior door.  *See* Dkt. No. 37-3 at 9.  Danielle Williams was asked to leave the interior area, and, at some point after, Defendant Watson also used the key to attempt to unlock the interior door, but he was unsuccessful.  *See* Dkt. No. 37-3 at 10.

Applying the curtilage-determining factors to the subject area, the Court finds that the mud room was "curtilage *per se.*" *Titemore*, 437 F.3d at 258.  The mud room is physically

---

[5] The area is described by Defendant Watson and Defendant Skibinski as an "enclosed porch," and Defendant Ciccone described the area as a foyer and the exterior door as the "main door to the dwelling."  *See* Dkt. No. 37-3 at 9, 11, 14.

attached to the main residence of the home and is enclosed on the other three sides by exterior walls with a roof. *See* Dkt. Nos. 37-6 at 39; 37-11 at 6. The area is described by Plaintiff as his mud room, and the exterior door of this mud room was closed and locked when approached by Defendants. *See* Dkt. No. 37-3 at 9.

However, as noted above, the Court must further evaluate whether Plaintiff Penree "manifested a subjective expectation of privacy in that area." *Hayes*, 551 F.3d at 146. The Court finds Plaintiff Penree's actions of locking the exterior door and referring to the enclosed space as his mud room demonstrates his subjective expectation of privacy in that space. *See* Dkt. No. 37-6 at 38. Further, Plaintiff Penree testifies that the exterior door is the door to his home, *see* Dkt. No. 37-6 at 36, the front door, *see id.* at 38, and the initial door to his home, *see id.* at 39. The undisputed facts in the record, clearly establish Plaintiff Penree's subjective expectation of privacy in his mud room.

Next, the Court turns to whether exigent circumstances justified a warrantless entry into Plaintiff Penree's home. "In determining whether exigent circumstances exist, '[t]he core question is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer, to believe that there was an urgent need to render aid or take action.'" *United States v. Simmons*, 661 F.3d 151, 157 (2d Cir. 2011) (quoting *United States v. Klump*, 536 F.3d 113, 117-18 (2d Cir. 2008)); *Loria*, 306 F.3d at 1284 (citing *United States v. McDonald*, 916 F.2d 766, 769 (2d Cir. 1990)). This test "is an objective one that turns on the district court's examination of the totality of the circumstances confronting law enforcement agents in the particular case." *McDonald*, 916 F.2d at 769 (citations omitted). The Second Circuit set forth the following factors as guides to determine if such exigent circumstances existed:

> (1) the gravity or violent nature of the offense with which the aspect is to be charged; (2) whether the suspect is reasonably believed to

> be armed; (3) a clear showing of probable cause . . . to believe that
> the suspect committed the crime; (4) strong reason to believe that
> the suspect is in the premises being entered; (5) a likelihood that the
> suspect will escape if not swiftly apprehended; and (6) the peaceful
> circumstances of the entry.

*Loria*, 306 F.3d at 1284 (stating that the list of factors is not an "exhaustive canon"); *see also*

*United States v. Reed*, 572 F.2d 412, 424 (2d Cir. 1978) (adopting the exigent circumstances

factors set forth in *Dorman v. United States*, 435 F.2d 385, 392-93 (D.C. Cir. 1970)).

The gravity or violent nature of the underlying offense is a factor that weighs heavily in

the determination of whether exigent circumstances exist. *See Welsh*, 466 U.S. at 750-52.

However, the Court is mindful that exigent circumstances are not created simply because there is

probable cause to believe that a serious crime has been committed. *See Welsh*, 466 U.S. at 753.

Moreover "[w]hen the government's interest is only to arrest for a minor offense, that presumption

of unreasonableness is difficult to rebut, and the government usually should be allowed to make

such arrests only with a warrant issued upon probable cause by a neutral and detached

magistrate." *Id.* at 750. The "application of the exigent-circumstances exception in the context of

a home entry should rarely be sanctioned when there is probable cause to believe that only a

minor offense . . . has been committed." *Id.* at 741.

Defendants Watson, Ciccone, and Skibinski entered into Plaintiff Penree's home seeking

to arrest him for harassment in the second degree pursuant to the domestic complaint by Danielle

Williams. *See* Dkt. No. 41-4 at 3. Under New York law, harassment in the second degree is a

violation, *see* N.Y. PENAL LAW § 240.26, which "means an offense, other than a 'traffic

infraction,' for which a sentence to a term for imprisonment in excess of fifteen days cannot be

imposed," N.Y. PENAL LAW § 10.00(3); *see also* N.Y. CRIM. PROC. LAW § 140.10(1).

Harassment in the second degree is not a crime, meaning it is not a misdemeanor or a felony, in

New York.  *See* N.Y. PENAL LAW § 10.00(6).  Therefore, the gravity-of-the-offense factor weighs against finding that exigent circumstances existed prior to Defendant officers entering into Plaintiff Penree's home.

The second factor is whether "the suspect is reasonably believed to be armed" because the "[d]elay in arrest of an armed felon may well increase danger to the community . . . or to the officers at time of arrest."  *See Dorman*, 435 F.2d at 392.  This consideration also "bears materially on the justification for a warrantless entry."  *Id.*  The "mere suspicion or probable cause for belief of the presence of a firearm does not, on its own, *create* urgency."  *Harris v. O'Hare*, 770 F.3d 224, 236 (2d Cir. 2014).

The undisputed facts are that while Defendants Watson, Skibinski, and Ciccone were waiting with Danielle Williams in the enclosed mud room of Plaintiff Penree's home, she was asked by Defendants if there were any guns in the house.  *See* Dkt. No. 37-3 at 10, 14.  She responded that Plaintiff Penree "had hunting guns in the past but wasn't sure if he had any in the house."  *See id.*  The Court has already determined that the entry into the residence occurred when Defendants entered into the mud room.  There was no basis at that time to believe that Plaintiff Penree was armed.

Even if the Court were to consider that the threshold had not been breached when Defendants entered into the mud room, the facts discredit any belief that Plaintiff Penree was armed.  First, the police records from the 9-1-1 call document that Plaintiff Penree advised that there were no weapons or alcohol in the house.  *See* Dkt. No. 37-3 at 17.  Next, Defendants Watson and Skibinski testified that they were able to observe Plaintiff Penree "every few seconds" while he was moving through his house, and they could see him most of the time.  *See id.*; Dkt. No. 37-7 at 19.  Defendant Watson and Skibinski could also hear him speaking on the

phone to his brother, a police officer, about the circumstances. Dkt. No. 37-3 at 9-10, 14. In their observation of him, Defendants do not claim that they saw a weapon. Defendants also asked Danielle Williams to stand with them in the mud room, which is in close proximity to the locked door, while waiting for Plaintiff Penree to open the door. Defendants' actions do not reflect that they had any concern that she was in immediate danger or that the public at large was in immediate danger from Plaintiff Penree. *See* Dkt. No. 37-3 at 9-10, 14.

Defendant Skibinski described Plaintiff Penree's past interaction with police as "passively aggressed." *See* Dkt. No. 45-1 at 19. Although Plaintiff Penree was observed by Defendants to be agitated in his residence, he was not violent, and he did not use any foul language. *See* Dkt. No. 37-7 at 18, 20. Defendants have failed to present evidence in this case that is sufficient to establish a reasonable belief that Plaintiff Penree was armed, and, accordingly, the second *Dorman* factor also weighs against finding exigent circumstances.

The third factor is whether there was a "clear showing of probable cause" not just "the minimum of probable cause[] that is requisite even when a warrant has been issued." *See Dorman*, 435 F.2d at 392-93. A clear showing of probable cause includes "'reasonably trustworthy information,' to believe that the suspect committed the crime involved." *Dorman*, 435 F.2d at 392-93 (quoting *Beck v. State of Ohio*, 379 U.S. 89, 91 (1964)). According to Defendant Watson, Defendants entered into Plaintiff Penree's home to take him into custody on an arrest for harassment in the second degree. *See* Dkt. No. 37-7 at 24. The Court does not find that a clear showing of probable cause existed to justify a warrantless entry. Danielle Williams' version of the altercation is disputed by Plaintiff Penree's report to Defendants. Defendants did not witness the altercation, and, under New York law, a non-warrant arrest for a violation is

authorized only when committed in the arresting officer's presence. *See* N.Y. PENAL LAW §
140.10(1)(a).

Also, Defendant Skibinski testified that he was familiar with Danielle Williams from
previous domestic incidents. *See* Dkt. No. 45-1 at 11. Based upon Defendant Skibinski's
familiarity with Danielle Williams and Plaintiff Penree's domestic incidents, which are previously
described, the Court finds that Defendants could not rely upon Danielle Williams' disputed
complaint of a violation as a source of "reasonable trustworthy information" to justify a
warrantless entry into Plaintiff Penree's home.

The fourth factor, a strong reason to believe that the suspect is in the premises, is satisfied
here and not in dispute. The fifth factor is a likelihood that the suspect will escape if not swiftly
apprehended. Defendants contend that they were in hot pursuit of a fleeing suspect, *see* Dkt. No.
37-23 at 33-36, but this assertion is found to be without any basis in the record. Defendants argue
that Plaintiff Penree moved to flee inside the threshold of his residence, but this argument fails
because Defendants entered into Plaintiff Penree's residence at the time they entered into the mud
room. At that time, Plaintiff Penree was not within sight, let alone fleeing. Further, Defendants
did not chase Plaintiff Penree from a public location or the scene of a crime into his home such
that their "hot pursuit" of him justified a warrantless entry. *See Stanton v. Sims*, 134 S. Ct. 3, 6
(2013) (describing "hot pursuit" as an immediate or continuous pursuit of a "fleeing felon" from
the scene of a crime); *United States v. Santana*, 427 U.S. 38, 43 (1976) (finding a true "hot
pursuit" is a chase, no matter how long, that is set in motion in a public place).

The sixth factor takes into consideration the peaceful circumstances of the entry because,
if entry was not forcible, it shows a "reasonableness of police attitude and conduct." *Dorman*,
435 F.2d at 393. When Defendants Watson, Skibinski, and Ciccone entered the outer entrance

into the mud room, the evidence indicates that it was a peaceful entry because they used a key, and then they encountered another locked door preventing further entry into the interior of the home. *See* Dkt. Nos. 37-3 at 9; 37-7 at 21. However, the testimonies of Defendants Watson and Skibinski concentrate on the entry made at the interior door of the mud room, which was a forcible entry further into the home and involved Plaintiff D-M.W., a toddler.

According to Plaintiff Penree, he cracked open his front door while positioning his foot to prevent the door from opening wider. *See* Dkt. Nos. 37-6 at 45; 45-1 at 46. Defendants Watson, Ciccone, and Skibiniski then forcibly pushed the door open, even after the door stopped against his foot, and pressed their way into the home. *See* Dkt. Nos. 37-6 at 45; 45-1 at 46. Therefore, the Court does not find that Defendants have demonstrated peaceful circumstances that weigh in favor of the reasonable attitude and conduct of Defendants considering the circumstances of the subsequent forcible entry further into the interior of the home.

Considering the factors under *Dorman*, the Court concludes that Defendants have not established that exigent circumstances existed to justify a warrantless entry into Plaintiff Penree's home. "When an officer undertakes to act as his own magistrate, he ought to be in a position to justify it by pointing to some real immediate and serious consequences if he postponed action to get a warrant." *Welsh*, 466 U.S. at 751 (internal quotation marks omitted) (quoting *McDonald*, 335 U.S. 451, 459-60 (1948)). Here, Defendants have not established any real immediate and serious consequences.

Defendants contend that exigency existed under "the emergency aid doctrine." *See* Dkt. No. 37-23 at 33-34. The emergency aid doctrine is an exigency obviating the requirement of a search warrant, but this doctrine applies when there is a need to "render emergency assistance to an injured occupant or to protect an occupant from *imminent* injury." *Brigham City v. Stuart*, 547

32

U.S. 398, 403 (2006). Defendants have failed to establish on the facts, even from their perspective, that their entry was objectively reasonable. Defendants briefly assert this legal argument, but they do not direct the Court to facts that support these contentions.

The police record demonstrates that Defendants were present outside of Plaintiff Penree's home for, at a minimum, an hour before they made a warrantless entry. Defendants Watson, Skibinski, and Ciccone were aware that Defendant Skibinski observed the children and concluded that they were "okay." For a portion of that hour, Defendants Watson, Skibinski, and Ciccone could observe and hear Plaintiff Penree inside of his home as well as Plaintiff D-M.W. Presumably Defendants claim that they needed to provide emergency aid to Plaintiff Penree's children. However, Defendant Watson described his concern for the children because Plaintiff Penree's "mental state *maybe* wasn't such that he would be able to take care of children at that point." Dkt. No. 37-7 at 12. Defendant Skibinski testified that he was concerned for the welfare of the children because the police did not know "what the conditions were in the home, there's no way to - - who knows if stuff got broken while [Plaintiff Penree and Danielle Williams] were fighting." *See* Dkt. No. 45-1 at 18. Defendant Skibinski also stated that "[t]here could be glass on the floor or he may not have food there for them," or "[t]hey might not have clothes and stuff." *See id.*

The Court finds that Defendants' speculated concern for the children was not a sufficient basis together with the other factors discussed to establish that emergency aid needed to be rendered inside Plaintiff Penree's home such that an exception should be made to his Fourth Amendment rights.

### 3. Malicious Prosecution

Plaintiffs' seventh and eighth causes of action are a state law claim and a Section 1983 claim, respectively, alleging that Defendants maliciously prosecuted Plaintiff Penree for resisting arrest, acting in a manner injurious to a child, and two counts of harassment in the second degree. *See* Dkt. No. 19 at ¶¶ 69-79. In order to state a claim for malicious prosecution under Section 1983, a plaintiff must allege the elements under the state law claim and a post arraignment liberty restraint sufficient to implicate the plaintiff's Fourth Amendment rights. *See Fulton v. Robinson*, 289 F.3d 188, 195 (2d Cir. 2002); *Janetka v. Dabe*, 892 F.2d 187, 189 (2d Cir. 1989) (stating that a Section 1983 claim for malicious prosecution is "governed by state law in the absence of federal common law").

Under New York law, the elements of a malicious prosecution claim are

> (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.

*See Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997) (quoting *Russell v. Smith*, 68 F.3d 33, 36 (2d Cir. 1995)); *see also Martinez v. City of Schenectady*, 97 N.Y.2d 78, 84 (2001). Defendants move to dismiss these claims arguing that Plaintiff Penree's criminal proceeding did not terminate in his favor, that there was probable cause for commencing the criminal proceeding, and that there is no evidence of malice by Defendants. *See* Dkt. No. 37-23 at 20-23.

The Second Circuit has stated that a "favorable termination is not so much an element of a malicious prosecution claim as it is a prerequisite to commencement of the action." *Janetka*, 892 F.2d at 189 (noting that the requirement of favorable termination prevents inconsistent judgments). A malicious prosecution plaintiff is not required to prove "that the termination of the criminal proceeding was indicative of innocence," *Rothstein v. Carriere*, 373 F.3d 275, 287 (2d Cir. 2004) *see also Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 199 (2000) ("[D]ispositions

inconsistent with innocence . . . cannot be viewed as favorable to the accused"), but, "the absence of a conviction is not itself a favorable termination," *Martinez*, 97 N.Y.2d at 84.

"As a general rule, under the common law any final termination of a criminal proceeding in favor of the accused, such that the proceeding cannot be brought again, qualifies as a favorable termination for purposes of a malicious prosecution action." *Smith-Hunter*, 95 N.Y.2d at 195. However, the common law also provides for an exception to this general rule where the termination of the criminal proceedings is inconsistent with the innocence of the accused. *Id.* at 196; *see also Cantalino v. Danner*, 96 N.Y.2d 391, 395 (2001). Accordingly, the plaintiff's burden when bringing a malicious prosecution claim is to demonstrate a final termination of his or her criminal proceeding that is not inconsistent with innocence. *Rothstein*, 373 F.3d at 287; *see also Cantalino*, 96 N.Y.2d at 395; *Norton v. Town of Brookhaven*, 47 F. Supp. 3d 152, 158 (E.D.N.Y. 2014). These determinations are case specific and are made "under the circumstances of each case." *Cantalino*, 96 N.Y.2d at 396 (citing *Smith-Hunter*, 95 N.Y.2d at 196-97 (describing that the specific circumstances of each case dictate whether a final termination in the plaintiff's favor is inconsistent with innocence)).

Defendants' contention that a final disposition of a criminal proceeding is favorable only when it is "indicative of innocence" is incorrect. Dkt. No. 37-23 at 21; *see also Smith-Hunter*, 95 N.Y.2d at 199-202 (clarifying that the "indicative of innocence" test is not correct). As stated above, Plaintiff Penree is required to show that the criminal proceeding termination was not inconsistent with innocence. The criminal proceedings against Plaintiff Penree were dismissed by a city court judge in a four-page decision outlining the factual circumstances prior to Plaintiff's arrest and concluding that there were no exigent circumstances to enter Plaintiff Penree's residence to arrest him. *See* Dkt. No. 41-10 at 4. The criminal proceeding was dismissed and

could not be brought again.  *See* Dkt. No. 41-10.  There is no indication that the evidence recited

would result in a conviction but for the unlawful arrest.  *See id.*

To the contrary, the city court judge commented that there was no evidence offered that

the children's health, safety, or welfare were in danger.  *See id.*  The city court judge did not state

any facts beyond the forcible entry into Plaintiff Penree's residence.  *See id.*  Accordingly, the

decision dismissing Plaintiff Penree's criminal charges is not inconsistent with innocence.  The

termination of a criminal proceeding is not unfavorable because "the underlying prosecution did

not reach the merits."  *Norton v. Town of Brookhaven*, 47 F. Supp. 3d 152, 158 (E.D.N.Y. 2014).

Applying New York common law, Plaintiff Penree's criminal proceeding terminated in his favor

for purposes of maintaining a malicious prosecution claim.

This case is distinguishable from other cases where dismissals based upon faulty search

warrants were not found to be favorable terminations.  *See, e.g., Layou v. Crews*, No. 9:11-CV-

0114, 2013 WL 5494062, *13 (N.D.N.Y. Sept. 30, 2013); *Martinez*, 97 N.Y.2d at 84-85.  In both

*Layou* and *Martinez*, the plaintiffs were convicted at their criminal trials, but the convictions were

reversed on appeal because the evidence was obtained through faulty search warrants.  *See Layou*,

2013 WL 5494062, at *13; *Martinez*, 97 N.Y.2d at 85.  The courts found that the criminal

proceedings were not favorable terminations because the plaintiffs' convictions at trial were

inconsistent with innocence.  *See Layou*, 2013 WL 5494062, at *13; *Martinez*, 97 N.Y.2d at 85.

Defendants next argue that probable cause to arrest Plaintiff Penree for harassment in the

second degree also fulfills the required probable cause element of malicious prosecution.  *See*

Dkt. No. 37-23 at 22.  Defendants further argue that the facts that Plaintiff "would not let the

Defendant officers open the house door," continued to hold his toddler child when Defendants

forced their way into his residence, pulled his arm away from Defendant Skibinski, and pushed

Defendant Watson away constitute probable cause for the charges of harassment in the second degree, resisting arrest, and acting in a manner injurious to a child. *See id.*

In the context of a malicious prosecution claim, there must be probable cause to believe that the plaintiff could be successfully prosecuted, which is distinct from probable cause to arrest a suspect. *See Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 417 (2d Cir. 1999). It is error to "conflate" these two elements. *See id.*; *D'Angelo v. Kirschner*, 288 Fed. Appx. 724, 726-27 (2d cir. 2008). The question before the Court, therefore, is whether there was "'knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of.'" *Roundseville v. Zahl*, 13 F.3d 625, 629 (2d Cir. 1994) (quoting *Pandolfo v. U.A. Cable Sys. of Watertown*, 171 A.D.2d 1013, 1013 (4th Dep't 1991)).

The "finding of probable cause to arrest as to one charge does not necessarily defeat a claim of malicious prosecution as to other criminal charges that were resolved in the plaintiff's favor." *Id.* Also, the element of probable cause in a malicious prosecution claim "must relate to the specific crime charged in the criminal proceeding." *Genovese v. County of Suffolk*, No. 10-CV-3470, 2015 WL 5210550, *3 (E.D.N.Y. Sept. 8, 2015).

As discussed above, Defendants did not rebut the presumption that their warrantless entry and arrest was unlawful and in violation of Plaintiff Penree's Fourth Amendment rights. Defendants Watson, Skibinski, and Ciccone illegally entered into Plaintiff Penree's home to arrest him for harassment in the second degree without a warrant, without probable cause, and without exigent circumstances. "The fruit of the poisonous tree doctrine is an evidentiary rule that operates in the context of criminal procedure" to preclude evidence obtained from or as a result of unlawful police activity. *Townes v. City of New York*, 176 F.3d 138, 145 (2d Cir. 1999); *see also*

*Costello v. United States*, 365 U.S. 265, 280 (1961). Although the fruit of the poisonous tree doctrine does not apply in Section 1983 claims, *see Townes*, 176 F.3d at 145, evidence obtained illegally that "would clearly not be admissible" cannot then be the basis for probable cause to believe the prosecution could succeed. *Boyd v. City of New York*, 336 F.3d 72, 77 (2d Cir. 2003) (postulating that the plaintiff's statement, if given without *Miranda* warnings, would not be admissible and "then there would be no probable cause to believe the prosecution could succeed"); *see also Gannon v. City of New York*, 917 F. Supp. 2d 241, 245 (S.D.N.Y. 2013); *Mazyck v. Johnson*, No. 08-CV-548, 2009 WL 2707360, *5 (E.D.N.Y. Aug. 25, 2009) (stating that the Second Circuit was clear in *Boyd* that "the question is not whether there exists probable cause to prosecute, but rather whether there is probable cause to *believe that a prosecution will succeed*").

As to Plaintiff Penree's first charge of harassment in the second degree in violation of New York Penal Law § 240.26(1) based upon the complaint filed by Danielle Williams, the Court finds that Defendants did not establish as a matter of law that there was probable cause to initiate proceedings. First, the Court's finding that Defendants failed to establish that there was probable cause to arrest Plaintiff Penree, "entails the rejection of [Defendants'] present argument about probable cause." *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 413 (2d Cir. 1999).

As already stated by the Court, under New York law, a violation must occur in the officer's presence in order for there to be authority to arrest a suspect. *See* N.Y. CRIM. PROC. LAW § 140.10(1); N.Y. PENAL LAW §§ 10.00(3), 240.26. Moreover, "the offense must occur in the officer's presence to provide probable cause to arrest for second-degree harassment." *See Ramos v. City of New York*, 298 Fed. Appx. 84, 86 (2d Cir. 2008). Although the Court previously noted that probable cause to arrest under the Fourth Amendment is not affected by New York law, for

purposes of evaluating whether there is probable cause to believe a suspect could be successfully prosecuted, the specific New York statute is determinative. *See D'Angelo v. Kirschner*, 288 Fed. Appx. 724, 726 (2d Cir. 2008); *Posr*, 180 F.3d at 413 (2d Cir. 1999); *Genovese*, 2015 WL 5210550, at *3 (stating that probable cause must relate to the specific crime charged). Here, there was no probable cause to believe that Plaintiff Penree would be successfully prosecuted when his arrest was unlawful pursuant to New York law.

As for the other charges against Plaintiff Penree, they are each based on actions taken after Defendants Watson, Skibinski, and Ciccone entered into the mud room. Because the evidence obtained after Defendants Watson, Skibinski, and Ciccone entered into Plaintiff Penree's mud room without a warrant, without probable cause to arrest, and without exigent circumstances was clearly going to be inadmissible evidence at a criminal trial, there was no reasonable belief that Defendants would be able to successfully prosecute him on those charges. Accordingly, Defendants have failed to establish probable cause as a defense to Plaintiff Penree's claim for malicious prosecution.

In a malicious prosecution claim, the lack of probable cause creates an inference of malice. *See Ramos*, 298 Fed. Appx. at 86 (citing *Boyd*, 336 F.3d at 78); *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 131 (2d Cir. 1997). Defendants argument that there was no direct evidence of malice is not persuasive in light of this permissible inference.

### 4. Excessive Force

Plaintiff Penree alleges that the use of force by Defendants Watson, Skibinski, and Ciccone was excessive during his arrest. *See* Dkt. No. 19 at ¶¶ 31-36. Specifically, Plaintiff

Penree alleges that the use of a Taser Handheld Conducted Electrical Weapon[6] ("Taser CEW") and the manner in which the handcuffs were applied violated his constitutional rights. *See id.* Further, he alleges that Defendant City of Utica's police department has a policy and practice that directly encourages the misconduct complained of in this case by failing to train, supervise, or control its officers regarding the use of force and by failing to adequately punish and discipline prior instances of similar misconduct. *See id.* Defendants argue that the use of the taser was objectively reasonable because Plaintiff Penree (1) was a large, muscular person, (2) was actively resisting arrest, (3) allegedly threatened officers the day before, and (4) had barricaded himself in his bedroom. *See* Dkt. No. 37-23 at 11.

Where an excessive force claim arises in the context of an arrest, it is the protections of the Fourth Amendment that are invoked. *See Graham v. Connor*, 490 U.S. 386, 394-95 (1989). Accordingly, the Court must apply the reasonableness test of the Fourth Amendment, which is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397 (quoting *Scott v. United States*, 436 U.S. 128, 137-39 (1978)). The Court does not evaluate the record in hindsight but, instead, from the "perspective of a reasonable officer on the scene." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (internal citations and quotation marks omitted). The reasonableness test must carefully review the totality of the circumstances of each particular case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest

---

[6] The conducted electrical weapon used by Defendant Skibinski against Plaintiff Penree was a TASER X26. *See* Dkt. No. 37-15. The Taser CEW can cause death or serious injury. *See* Dkt. No. 41-11. The CEW is intented to temporarily incapacitate a person. *See id.*

or attempted to evade arrest by flight." *See Graham*, 490 U.S. at 396; *see also Tracy*, 623 F.3d at 95-96; *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 123 (2d Cir. 2004).

In the present case, Defendants Watson, Skibinski, and Ciccone entered into Plaintiff Penree's home to arrest him for harassment in the second degree, *see* Dkt. No. 41-4 at 3, which is an offense that is not a crime under New York law, *see* N.Y. CRIM. PROC. LAW § 140.10(1); N.Y. PENAL LAW §§ 10.00(3), (6). Plaintiff Penree was inside his home with his two small children. *See* Dkt. No. 45-1 at 14. Defendants have not raised or produced any evidence to indicate that there was any danger Plaintiff Penree might flee the home. However, it is undisputed that Plaintiff Penree ran up the stairs and into his bedroom to get away from Defendants, and he attempted to shut the bedroom door on the officers. *See* Dkt. No. 37-6 at 45-47.

Both Defendant Watson and Skibinski stated in their reports that they could see that Plaintiff Penree was holding Plaintiff D-M.W. in his arms and that he was turned away with his back facing the officers. *See* Dkt. No. 37-3 at 10, 14. Plaintiff Penree was in a corner of the room. *See* Dkt. No. 37-3 at 10. Defendant Skibinski stated that he reached out to grab Plaintiff Penree's arm but that Plaintiff Penree pulled his arm away so Defendant Skibinski drew the Taser CEW from its holster, announced "Taser Taser Taser," and deployed it. *See id.* at 14. Defendants' expert report states two probes, each with a barbed dart on the end, were launched out of the Taser CEW at fifty-five meters per second and lodged into Plaintiff Penree's back. *See* Dkt. No. 37-15 at 9. An electrical discharge then flowed between the darts "resulting in widespread loss of voluntary muscle control (or incapacitation) and generalized intense pain." *See id.*

Defendant Watson did not state in the police report that Plaintiff Penree pulled away or pushed Defendant Skibinski but, instead, states that he was grabbing the child when he heard

Defendant Skibinski say "Taser." *See id.* at 10. At his deposition, Defendant Watson testified that he was not pushed but that "there was some pushing, some of that." *See* Dkt. No. 37-7 at 31. Plaintiff Penree testified that at no time did Defendants tell him he was under arrest prior to being handcuffed, but Defendants did tell him to stop resisting when he tried to shut them out of the bedroom. *See* Dkt. No. 37-6 at 48. Plaintiff Penree also claims that Defendants did not give any warning before deploying the Taser CEW. *See id.* at 49. Plaintiff claims that he voluntarily moved away from blocking the door but that, as soon as they came into the bedroom, he was shot with the Taser CEW. *See id.* Defendants argue in their brief, and the police report supports, that Defendants Watson, Skibinski, and Ciccone concluded that Plaintiff Penree was a threat of safety to the officers and planned to use the Taser CEW over the pepper spray before they forced entry through the mud room door. *See* Dkt. Nos. 37-3 at 9; 37-23 at 13.

It is possible that a jury could find that the use of the Taser CEW was reasonable, but it is also possible that a jury could find that the use of the Taser CEW was not a reasonable response to the circumstances. *See Amnesty*, 361 F.3d at 124 (finding that the reasonableness of the forced used in that case was one for the jury); *Jackson v. City New York*, 939 F. Supp. 2d 235, 254 (E.D.N.Y. 2013) (identifying the significant dispute between the officers' story that the plaintiff was resisting arrest and the plaintiff's story that she was defensively struggling against the officer's unlawful arrest). Accordingly, the Court finds that the determination as to the objective reasonableness of the force used is one to be made by a jury following a trial.

With regard to Plaintiff Penree's claim that the manner in which he was handcuffed was unreasonable, the Court finds that Defendants have established as a matter of law that the handcuffing of Plaintiff Penree did not involve an unreasonable amount of force, and Plaintiff Penree did not raise any genuine questions of material fact in opposition. In order for handcuffs

to be effective, they must be reasonably tight. *See Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008). However, "overly tight handcuffing can constitute excessive force." *Id.* at 468. "To assess a claim for excessive force based on handcuffing, the court should consider evidence that: '1) the handcuffs were unreasonably tight; 2) the defendants ignored the arrestee's pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists.'" *Pelayo v. Port Auth.*, 893 F. Supp. 2d 632, 642 (S.D.N.Y. 2012) (quoting *Matthews v. City of New York*, 889 F. Supp. 2d 418, 441-42 (E.D.N.Y. 2012)). The force used must be sufficiently serious or harmful to be actionable in a claim for excessive force. *See Pelayo*, 893 F. Supp. 2d at 642; *Drummond v. Castro*, 522 F. Supp. 2d 667, 678 (S.D.N.Y. 2012).

Plaintiff Penree testified that while he was being transported by car to the police station, he complained that the handcuffs were too tight. *See* Dkt. No. 37-6 at 56. He described that he has big wrists. *See id.* When Plaintiff arrived in the booking area, his handcuffs were loosened, which occurred about five minutes after arriving at the police station. *See id.* Different handcuffs were then used that were not too tight. *See id.*

In opposition to Defendants' motion, Plaintiffs argue that the timing for when Defendants placed two linked sets of handcuffs on Plaintiff Penree is in dispute. *See* Dkt. No. 44 at 17. However, even assuming Plaintiffs' time line of events, the handcuffs were apparently not too tight until Plaintiff Penree was sitting on his hands during the transport to the police station, and the handcuffs were loosened shortly after arrival. *See* Dkt. No. 37-6 at 52, 55-56. Further, Plaintiff Penree indicated that he had some redness on his wrist but does not claim to have any other injury as a result. *See* Dkt. No. 37-6 at 55. He did not receive any medical treatment for his wrists at the police station, and he does not have any outstanding medical bills for treatment. *See* Dkt. No. 37-6 at 53, 60-61. The Court finds that Plaintiff did not submit evidence that could

lead a reasonable juror to find that Defendants used excessive force in the application of the handcuffs. *See Drummond*, 522 F. Supp. 2d at 679.

## D. Fourteenth Amendment

Plaintiff D-M.W. also claims that Defendants Watson, Skibinski, and Ciccone used excessive force against him when they discharged the Taser CEW. *See* Dkt. No. 19 at ¶¶ 31-36. Defendants argue that they did not cause any physical injury to Plaintiff D-M.W. *See* Dkt. No. 37-23 at 23-25. According to Defendants the electrical current would travel only between the two probes of the Taser CEW and, therefore, no electrical current would have injured Plaintiff D-M.W. *See* Dkt. No. 37-23 at 23-25. In the alternative, Defendants argue that, even if there was causation, their actions were not conscience shocking in violation of his Fourteenth Amendment rights. *See id.* at 25-27. Plaintiffs argue that there was a seizure of Plaintiff D-M.W. in violation of his constitutional rights because he was deprived of his ability to leave the room through his custodial parent, Plaintiff Penree. *See* Dkt. No. 44 at 22.

A seizure under the Fourth Amendment is "'an intentional acquisition of physical control.'" *Landol-Rivera v. Cruz Cosme*, 906 F.2d 791, 795 (1st Cir. 1990) (quoting *Brower v. Cty. of Inyo*, 489 U.S. 593, 596 (1989)). Fourth Amendment seizure is not "police action that simply *causes* a particular result." *Id.* at 795 (clarifying further that the intention requirement is not met by the deliberateness with which a given action is taken). Seizure under the Fourth Amendment "does not occur whenever there is a governmentally caused termination of an individuals' freedom of movement, . . . but only when there is a governmental termination of freedom of movement *through means intentionally applied*." *Brower*, 489 U.S. at 596-97. The restraint of liberty must result from an attempt to gain control of the particular individual. *See Landol-Rivera*, 906 F.2d at 795 (citing *Brower*, 489 U.S. at 596).

Defendants use of the Taser CEW against Plaintiff Penree was not a Fourth Amendment seizure of Plaintiff D-M.W. because Plaintiff D-M.W. was not the intended object when they aimed the Taser CEW. *See id.* at 795 (stating that the plaintiff's decedent was not seized when he was not the object of the police bullet that struck him). Defendants Watson, Skibinski, and Ciccone did not intend to terminate Plaintiff D-M.W.'s freedom of movement when they deployed the Taser CEW, and, accordingly, he was not seized under the Fourth Amendment.

Plaintiffs further argue the "custodial seizure" of Plaintiff D-M.W. *See* Dkt. No. 44 at 22. In support of this contention, Plaintiffs cite *Wallace v. Poulos*, Civil Action No. DKC 2008-0251, 2009 WL 3216622 (D. Md. Sept. 29, 2009). In that case, the plaintiff father was the sole custodian of the infant plaintiff when the defendant police officers executed a temporary protective order that was falsely-obtained by the infant plaintiff's mother. The defendant police officers wrongly believed that the order transferred custody of the infant plaintiff to the biological mother, who did not have any custodial rights or visitation. *See id.* After an altercation with the defendant police officers, the plaintiff father was arrested and the infant plaintiff was taken from the home and given into the custody of the biological mother by the defendant police officers. *See id.* at *12. The court found that the infant plaintiff was seized by the defendants under these circumstances because the plaintiff father was not permitted to direct the temporary custody of the infant plaintiff. *See id.*

Here, the facts are distinguishable because Plaintiff Penree does not claim to have sole custody of his children. He and Danielle Williams have shared custody and/or visitation of their children pursuant to a custody order. *See* Dkt. No. 45-1 at 8, 41. At the time that Plaintiff Penree was under arrest and taken into custody, Danielle Williams, Plaintiff D-M.W.'s legal custodian and parent, was present and took her children into her custody. *See* Dkt. No. 37-3 at 10.

Plaintiffs have failed to show that Plaintiff D-M.W. was seized under the Fourth Amendment by Defendants when his mother rightfully took him into her care.

Having determined that there was no Fourth Amendment seizure of Plaintiff D-M.W., the Court must consider Plaintiff D-M.W.'s excessive force claims under substantive due process of the Fourteenth Amendment.[7] *See Tierney v. Davidson*, 133 F.3d 189, 199 (2d Cir. 1998) (citing *Graham*, 490 U.S. at 394-95) (stating that where there is not a seizure or arrest, excessive force claims are governed by the Due Process Clause of the Fourteenth Amendment); *Piper v. City of Elmira*, 12 F. Supp. 3d 577, 587 (W.D.N.Y. 2014). The Second Circuit applies the four-part test of *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973), to determine whether the force applied was excessive under the Fourteenth Amendment. *See Tierney*, 133 F.3d at 199.

> Those factors are: '[1] the need for the application of force, [2] the relationship between the need and the amount of force that was used, [3] the extent of injury inflicted, and [4] whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'

*Id.* (quoting *Johnson*, 481 F.2d at 1033).

In this case, the Court cannot conclude that Plaintiff D-M.W.'s claim fails as a matter of law after considering these four factors. It is a question for the jury to consider the circumstances and determine whether there was a need to apply force and to weigh the relationship between that need with the force used. Plaintiff D-M.W. sustained a physical injury to his head as a result of Defendants' actions, and he was examined by emergency medical responders at the scene. *See* Dkt. Nos. 37-3 at 10; 37-6 at 49; 37-12 at 2, 4. Plaintiffs allege that Plaintiff D-M.W. sustained injury from the electrical current released from the Taser CEW. *See* Dkt. No. 37-6 at 49.

---

[7] Plaintiffs only argue a violation Plaintiff D-M.W.'s Fourteenth Amendment rights in their memorandum of law despite their contention that Plaintiff D-M.W. was seized. *See* Dkt. No. 44 at 20-22.

Defendants argue that his claim should be dismissed because they have submitted unopposed expert's opinion that the electricity from the Taser CEW would take the path of least resistance between the two probes. *See* Dkt. No. 37-15 at 4. According to Defendants, this expert's opinion precludes Plaintiffs from showing any injury and so the claim fails. *See id.* As noted, Plaintiff D-M.W's alleged injuries were not limited to just electrocution but also included a head injury. Therefore, Plaintiff D-M.W's excessive force claim does not fail for lack of electrocution injury. Further, a jury could reject the expert opinion proffered by Defendants. After all, a jury is free to refuse to credit an expert's opinion even when there is no expert rebuttal. *See Passlogix, Inc. v. 2FA Tech., LLC*, 708 F. Supp. 2d 378, 398 (S.D.N.Y. 2010); *Giles v. Rhodes*, 171 F. Supp. 2d 220, 226-27 (S.D.N.Y. 2001) (citing *Powers v. Bayliner Marine Corp.*, 83 F.3d 789, 798 (6th Cir. 1996)).

While standing in Plaintiff Penree's mud room, Defendants Watson, Ciccone, and Skibinski discussed the potential use of force, concluding that the use of the Taser CEW was better than the use of pepper spray because of the children's presence inside. *See* Dkt. No. 37-3 at 9.[8] The evidence shows that Defendants could visualize Plaintiff D-M.W. in Plaintiff Penree's arms at the time they forcibly entered through the interior door and when the Taser CEW was deployed. *See* Dkt. No. 37-3 at 10-11, 14. Defendants have failed to establish as a matter of law that a jury could not find that the deployment of the Taser CEW under these circumstances to be shocking to the conscience. Therefore, the Court denies Defendants' motion for summary

---

[8] In the Second Circuit, a defendant can be a direct participant if he or she "authorizes, orders, or helps others to do the unlawful acts, even if he or she does not commit the acts personally." *Terebesi v. Torreso*, 764 F.3d 217, 234 (2d Cir. 2014). In *Terebesi*, the Court found that individuals who plan for a search or seizure that results in an unconstitutionally excessive use of force can be liable under Section 1983. *See id.* ("Even if the plan expressly contemplated only a search, the same Fourth Amendment protections would apply").

judgment on Plaintiff D-M.W.'s constitutional claim of excessive force. *See Piper*, 12 F. Supp. 3d at 87 (stating that the issue is not how likely it is a jury could find a Fourteenth Amendment violation but whether a jury could not reach that conclusion); *Masihuddin v. Gavin*, No. 10 Civ. 06006, 2014 WL 1091157, *5 (S.D.N.Y. Mar. 17, 2014).

## E.    Municipal Liability

Plaintiffs allege a claim against the City of Utica, the City of Utica Police Department, and Police Chief Mark Williams for failure to train, supervise, and discipline Defendants Watson, Skibinski, and Ciccone in their use of force when making arrests. *See* Dkt. No. 19 at ¶¶ 43-54. Further, Plaintiffs allege that Defendants City of Utica, City of Utica Police Department, and Williams made policies or procedures to inadequately train, supervise, or discipline the members of its police officers, which caused excessive force to be used against both Plaintiffs. *See id.* Defendants contend that they have established through the submission of training certificates and proof that the Utica Police Department has been an accredited agency by the New York State Accreditation Council, which requires compliance with 133 standards, that their policies and procedures were adequate in training, supervising, and disciplining their officers. *See* Dkt. No. 37-23 at 37-38. Defendants also contend that Plaintiffs' claims fail because there is no showing of the requisite deliberate indifference to the constitutional rights of citizens. *See id.*

As an initial matter, it appears that Plaintiffs may have voluntarily discontinued their action against the City of Utica Police Department, but, to the extent that they did not, the Court dismisses Plaintiffs' complaint against the City of Utica Police Department. In New York, departments are administrative arms of a municipal corporation and are not separate legal entities capable of being a party to a lawsuit. *See Baker v. Willett*, 42 F. Supp. 2d 192, 198 (N.D.N.Y. 1999); *Loria v. Town of Irondequoit*, 775 F. Supp. 599, 606 (W.D.N.Y. 1990).

In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), the Supreme Court established that municipalities and local governments can be sued directly under Section 1983 for monetary, declaratory, or injunctive relief where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  A governmental custom, even if it "has not received formal approval through the body's official decision[-]making channels," is equally actionable under Section 1983.  *Id.* at 691 (reasoning that the practices of state officials could be so well settled that they "constitute a 'customs or usage' with the force of law" (quoting *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)).

Here, Plaintiffs do not allege that there is a written policy or ordinance that is itself unconstitutional but that Defendants City of Utica and Williams' deliberate indifference created a custom of its police officers carrying out their duties in an unconstitutional manner.  *See* Dkt. No. 19 at ¶¶ 44-54.  A city can be liable under these circumstances "where the city is aware that its policy may be unconstitutionally applied by inadequately trained employees but the city consciously chooses not to train them, . . . or where the city's official policy on the reasonable use of force in arrests is valid, but the city's actual practice is to use excessive force."  *Amnesty Am.*, 361 F.3d at 125-26.

Where, as here, the allegations focus on a city employee's single tortious action, "the inquiry focuses on whether the actions of the employee in question may be said to represent the conscious choices of the municipality itself."  *Id.* at 126.  In this case, there is no proof, and the parties do not argue, that the acts were "taken by, or attributable to, one of the city's policymakers."  *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482-83 (1986) (finding that a single act by a policymaker with final authority can establish Section 1983 liability for an

unconstitutional policy)). The mere delegation of authority by the policymakers to a subordinate does not implicate liability against the municipality because that would be the equivalent of respondeat superior liability. *Id.* However, liability can be shown by proving that "'the authorized policy makers approve[d] a subordinate's decision and the basis for it.'" *Id.* (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion)).

Of course, a policymaking official can be implicated by direct evidence that they ordered a subordinate's action. *See id.* There is no evidence in this case that this occurred. A policymaking official can also be implicated through a subordinate's conduct by showing "that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." *Id.* (citing *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870-71 (2d Cir. 1992)). "Thus, where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence may 'be properly thought of as a city "policy or custom" that is actionable under § 1983.'" *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

Unless the unconstitutional incident includes proof that it was caused by an *existing*, unconstitutional municipal policy by a policymaker, "a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985). The existence of an unconstitutional policy, and its origin, must be proven separately to have a valid claim. *See id.* at 824. Further, where "the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Id.*

Plaintiffs claim to demonstrate a ratified policy of inadequate training and supervision by Defendants City of Utica and Williams through their deliberate indifference to Defendants Watson, Skibinski, and Ciccone's unconstituional acts towards Plaintiffs. *See* Dkt. Nos. 19 at ¶¶ 43-54; 44 at 26. Plaintiffs assert that the alleged use of excessive force by Defendants Watson, Skibinski, and Ciccone is attributable to the municipal Defendants because, at his deposition in this case, Defendant Williams found his officers' actions on April 23, 2012 were proper. *See* Dkt. No. 44 at 26. Ostensibly, Plaintiffs' theory is that the municipal Defendants were deliberately indifferent to the possibility that Defendants Watson, Skibinski, and Ciccone were prone to use excessive force. According to Plaintiffs, "this indifference was demonstrated by the failure of the City defendants to exercise reasonable care in investigating claims of police brutality in order to supervise the officers in the proper use of force." *Fiacco v. City of Rensselaer*, 783 F.2d 319, 326 (2d Cir. 1986).

Plaintiffs rely soley on Defendant Williams' review of the alleged excessive force at issue in this civil rights lawsuit to establish that the municipal Defendants were deliberately indifferent to these practices. *See* Dkt. No. 44 at 26. "[T]he existence of a policy of nonsupervision amounting to deliberate indifference to constitutional rights cannot be established by inference soley from evidence of the occurrence of the incident in question." *See id.* at 328; *see also City of Oklahoma City*, 471 U.S. at 824. Therefore, Defendant Williams' "deliberate indifference" to Plaintiffs' allegations alone cannot establish an inference of a municipal policy. *See Fiacco*, 783 F.2d at 328 (stating that a plaintiff cannot prevail on such a claim without other evidence). Plaintiffs' sole reliance on this evidence to prove a municipal policy of inadequate supervision is fatal. *See City of Oklahoma*, 471 U.S. at 824.

Moreover, Plaintiffs' claim that Defendants City of Utica and Williams' policy and procedure of inadequate training caused the excessive force of unjustified tasing of Plaintiff Penree is also flawed. *See* Dkt. No. 19 at ¶¶ 45-49. In *City of Canton*, the Supreme Court established municipal liability under Section 1983 for its failure to train its employees. *See id.* at 387-90. "[A] municipality can be liable for failing to train its employees where it acts with deliberate indifference in disregarding the risk that its employees will unconstitutionally apply its policies without more training." *Amnesty Am.*, 361 F.3d at 129 (citing *City of Canton*, 489 U.S. at 387-90). To establish liability due to the inadequacy of a municipality's training program, a plaintiff must (1) "identify a specific deficiency in the city's training program," (2) "establish that [the identified] deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation," and (3) establish that the failure to train constitutes deliberate indifference to the plaintiff's constitutional rights. *See id.* at 129.

In this case, Plaintiffs have not provided any evidence of the City of Utica Police Department's training programs, and Plaintiffs have not identified a specific deficiency in a training program or a close causal relationship to the constitutional injuries sustained. These required elements ensure that "'the officer's shortcomings . . . resulted from . . . a faulty training program' rather than from the negligent administration of a sound program." *Id.* at 129 (quoting *City of Canton*, 489 U.S. at 391) (concluding that to state a failure to train claim under Section 1983, the plaintiffs are required "to prove that the deprivation occurred as the result of a municipal policy rather than as a result of isolated misconduct by a single actor"). Without some evidence showing how the training was performed and without evidence showing how the training, if performed correctly, could have prevented the constitutional violations alleged, no

reasonable jury "could conclude that the excessive force occurred as a result of training deficiencies." *Amnesty Am.*, 361 F.3d at 130.

For these reasons, the Court dismisses the claims against Defendants City of Utica and Williams.

## G.    Qualified Immunity

"Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Tracy v. Freshwater*, 623 F.3d 90, 95-96 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Kelsey v. Cty. of Schoharie*, 567 F.3d 50, 60-61 (2d Cir. 2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))). The Court is mindful that qualified immunity is "'an entitlement not to stand trial or face the other burdens of litigation,'" and that this privilege is "'effectively lost if a case is erroneously permitted to go to trial.'" *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). The Court applies a two-part inquiry to determine whether the doctrine of qualified immunity bars a suit against government officials. *See Jones v. Parmley*, 465 F.3d 46, 55 (2d Cir. 2006). The Court considers whether the facts, construed in favor of the party asserting the injury, "demonstrate a violation of a constitutional right." *See id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The Court must also determine "whether the officials' actions violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). It is within the Court's discretion to decide the order these two prongs are considered. *See Pearson v. Callahan*, 555 U.S. 223, 243 (2009).

"A qualified immunity defense is established if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir. 1996) (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). The plaintiff can successfully defeat the defense of qualified immunity on summary judgment by raising a genuine issue of material fact. *See Jones v. Parmley*, 465 F.3d 46, 63 (2006) (finding that a question of material fact precludes the court's finding as a matter of law that the defendants are entitled to qualified immunity); *Usavage v. Port Auth.*, 932 F. Supp. 2d 575, 593 (S.D.N.Y. 2013) (citing *Green v. Montgomery*, 219 F.3d 52, 59 (2d Cir. 2013)).

A clearly established constitutional right is one that's "contours" are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). An official's actions are not protected by qualified immunity by virtue of the fact that his or her action in question has not previously been held unlawful. *See id.; Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014) ("An officer is not entitled to qualified immunity on the grounds that the law is not clearly established every time a novel method is used to inflict injury"). "[I]f decisions from this or other circuits clearly foreshadow a particular ruling on the issue," the Court may treat the law as clearly established. *See Terebesi*, 764 F.3d at 231 (internal quotation marks omitted) (stating that the courts "consider the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law" in determining whether the law is clearly established) (quoting *Varrone v. Bilotti*, 123 F.3d 75, 79 (2d Cir. 1997)).

### 1. Fourth & Fourteenth Amendments

Defendants assert that Plaintiff Penree's Fourth Amendment rights and Plaintiff D-M.W.'s Fourteenth Amendment rights "are no longer clearly established because the current law conflicts with the Fourteenth Amendment Rights of the Domestic Violence victim under a state created danger Substantive Due Process theory." Dkt. No. 37-23 at 29. According to Defendants, they are entitled to qualified immunity against all of Plaintiffs' Fourth and Fourteenth Amendment claims because there is a lack of clearly established law. *See id.* The Second Circuit has established "that the Due Process Clause may be violated when police officers' *affirmative* conduct–as opposed to passive failures to act–creates or increases the risk of private violence, and thereby enhances the danger to the victim." *Okin v. Village of Cornwall-On-Hudon Police Dep't*, 577 F.3d 415, 428-29 (2d Cir. 2009) ("The affirmative conduct of a government official may give rise to an actionable due process violation if it communicates, explicitly or implicitly, official sanction of private violence").

In *Okin*, the court applied this state-created danger doctrine to a domestic violence situation. *See id.* In that case, the police responded to the plaintiff's complaint of being beaten and choked, and the police proceeded to have a conversation about football with the aggressor. *See id.* at 430. The aggressor also told one of the defendant officers that he was not able to "help it sometimes when he smacks [the plaintiff] around," and the defendants did not make an arrest. *See id.* There, the defendants also responded to numerous occasions of domestic incident complaints by the plaintiff without filing a domestic incident report, interviewing the aggressor, or making an arrest. *See id.* Under those circumstances, the Court found that there was a reasonable view of the evidence to support a finding that the defendants' actions were affirmative reassurances to the aggressor that no action would be taken against him for his acts of violence against the victim. *See id.*

Without any support, Defendants argue that Plaintiffs' asserted Fourth and Fourteenth Amendment Rights are no longer clearly established because their rights are in conflict with the *Okin* decision from Second Circuit. *See* Dkt. No. 37-23 at 28-33. It is Defendants' contention that they had to choose between securing the safety of domestic violence victims and Plaintiffs' constitutional rights secured by the Fourth and Fourteenth Amendments. *See id.* The Court finds that Defendants have no legal or logical basis for this assertion. The establishment of case law that police officers, through affirmative acts of creating and increasing the risk of domestic violence against a victim, violated that victim's constitutional rights does not change or effect the clarity of established rights under the Fourth and Fourteenth Amendments. The *Okin* decision does not imply that an alleged domestic violence offender has lesser constitutional rights under the Fourth or Fourteenth Amendments.

### 2. Excessive Force

With regard to Defendants' specific contention that they are entitled to qualified immunity on Plaintiffs' claims of excessive force, they argue that "qualified immunity operates to protect officers from the sometimes hazy border between excessive and acceptable force." *See* Dkt. No. 37-23 at 36. Qualified immunity is an affirmative defense and, as such, Defendants bear the burden of proving that the privilege of qualified immunity applies. *See Coolick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012). The Court finds that Defendants' abbreviated arguments fail to raise any factual or legal support for their entitlement to qualified immunity against Plaintiffs' claims of excessive force. Accordingly, the Court denies their motion for summary judgment on the invocation of qualified immunity against Plaintiffs' excessive force claims.[9]

---

[9] Although Defendants raise immunity under New York law against Plaintiffs' claims for negligence and gross negligence, Defendants do not raise immunity under New York law against Plaintiff D-M.W.'s claim for assault and battery.

Even if the Court were to find that Defendants met their prima facie burden, the Court would find that Plaintiffs have raised questions of material fact that must be resolved by a jury prior to determining whether it would have been clear to a reasonable officer that his conduct was unlawful in this situation. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks and citations omitted) (quoting *Tennessee v. Garner*, 471 U.S. at 8).

Courts have described the use of a taser to be more than a trivial use of force but less than deadly force. *Towsley v. Frank*, No. 5:09-cv-23, 2010 WL 5394837, *10 (D. Vt. Dec. 28, 2010) (citing *Mattos v. Aragano*, 590 F.3d 1082, 1087 (9th Cir. 2010)). The use of a taser is a "'serious intrusion into the core of the interests protected by the Fourth Amendment.'" *Id.* (quoting *Mattos*, 590 F.3d at 1087). The law is clearly established that any "significant degree of force . . . should not be used lightly or gratuitously against an arrestee who is complying with police commands or otherwise poses no immediate threat to the arresting officer." *Tracy*, 623 F.3d at 98 (citing *Henderson v. Munn*, 439 F.3d 497, 502-03 (8th Cir. 2006); *Vinyard v. Wilson*, 311 F.3d 1340, 1348-49 (11th Cir. 2002); *Headwaters Forest Def. v. Cty. of Humboldt*, 276 F.3d 375, 286 (9th Cir. 2002); *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994)).

In 2011, the Ninth Circuit found that the police officer's use of a taser was an excessive use of force and a constitutional violation. *See Mattos*, 661 F.3d at 451. There, the officers gave no warning that the taser would be used, the suspects had no weapons, and there were children present in the home. *See id.* The court found a constitutional violation under those circumstances even factoring in that the situation was potentially dangerous. *See id.* at 451. In that case, the

court found that "an officer's failure to warn, when it is plausible to do so, weighs in favor of finding a constitutional violation." *Id.* ("[T]he fact that [the defendant] gave no warning to [the plaintiff] before tasing her pushes this use of force far beyond the pale"); *see also Bryan v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010) (considering that if it was feasible to give a warning that the use of force was imminent if there was not compliance and a warning was not issued, then the facts weigh against a finding of reasonable force); *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1285 (10th Cir. 2007) ("The absence of any warning–or of facts making clear that no warning was necessary– makes the circumstances of this case especially troubling")).

In 2009, the Eighth Circuit found that "it is clearly established that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public." *See Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009). In 2010, the Tenth Circuit held that the law was clearly established in 2003 that an officer "could not use his Taser on a nonviolent misdemeanant who did not pose a threat and was not resisting or evading arrest without first giving a warning." *See Cavanaugh v. Woods Cross City*, 625 F.3d 661, 667 (10th Cir. 2010).

Accepting Plaintiff Penree's version of the facts, he was repeatedly told that he was not under arrest, and he was not told that he was under arrest until being handcuffed. *See* Dkt. No. 37-6 at 48. Further, according to Plaintiff Penree, he had moved away from the bedroom door and was no longer actively resisting their entrance. *See id.* at 45-47. Defendants were aware that Plaintiff Penree was holding a toddler and facing the corner of the bedroom. *See id.*; Dkt. No. 41-4 at 3. Defendants had discussed the potential use of force and the preference for the Taser CEW prior to any alleged resistance. *See* Dkt. No. 37-3 at 9. Plaintiff Penree claims that his interactions with Defendants had been calm and no profanity was being used up until the time the

officers forcibly entered the mud room door. *See* Dkt. Nos. 37-7 at 18, 20; 45-1 at 12. Also, a significant factor in this case, was that Defendants did not give Plaintiffs any warnings before using the Taser CEW. Plaintiff claims that as soon as Defendants came through his bedroom door, he was tased. *See* Dkt. Nos. 37-6 at 48-49; 41-4 at 3. Accordingly, the Court finds that Defendants have not established that they are entitled to the privilege of qualified immunity.

### 3. False Arrest

Defendants' argue that they are entitled to qualified immunity on Plaintiff Penree's claim that he was falsely arrested because there was arguable probable cause for his arrest. *See* Dkt. No. 37-23 at 35. Plaintiff Penree's right to be free of arrest without probable cause was clearly established at the time of his arrest. *See Jenkins*, 478 F.3d at 87 (citing *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000)). Arguable probable cause exists when officers of reasonable competence could disagree on whether there was probable cause. *See Amore v. Novarro*, 624 F.3d 522, 536 (2d Cir. 2010); *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004); *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002). Arguable probable cause does not mean "almost" probable cause. *See Jenkins*, 478 F.3d at 87. Considering, as the Court must, the information possessed by Defendants Watson, Skibinski, and Ciccone at the time of the arrest, the Court finds that there are questions of material fact that must be resolved by a jury before qualified immunity for false arrest can be determined.

Defendants contend that there was arguable probable cause to arrest Plaintiff Penree on the charge of harassment in the second degree based upon Danielle Williams written complaint describing that she was pushed down to the ground and out the door, which caused her to fall down some stairs. *See* Dkt. No. 37-23 at 18-20, 36. The Court has already determined that Defendants failed to rebut the presumption that the warrantless arrest was unlawful. The Court

found that there is a question of material fact as to whether Danielle Williams' statement to Defendants Skibinski and Ciccone was reasonably reliable under the circumstances. The Court finds this question of fact precluding summary judgment on probable cause also precludes a legal finding on qualified immunity for the unlawful arrest claim. Therefore, the Court denies Defendants' motion for summary judgment on Plaintiff Penree's claim for false arrest in violation of his Fourth Amendment rights.

### 4. Malicious Prosecution

Defendants contend that they are entitled to qualified immunity against Plaintiffs' claims for malicious prosecution because arguable probable cause existed for all the charges brought against Plaintiff Penree. *See* Dkt. No. 37-23 at 22-23, 35-36. Probable cause in the context of a malicious prosecution claim is "the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of." *Jackson v. City of New York*, 939 F. Supp.2d 235, 250 (E.D.N.Y. 2013) (internal quotation marks and citations omitted) (quoting *Rounseville v. Zahl*, 13 F.3d 625, 629-30 (2d Cir. 1994)).

The Court finds that Defendants have failed to establish that they are entitled to qualified immunity against Plaintiff Penree's malicious prosecution claims. Construing the evidence in favor of Plaintiffs, no reasonably competent officer could agree that there was probable cause to successfully prosecute Plaintiff Penree. As the Court set forth in its discussion of malicious prosecution, New York law is determinative when evaluating the probable success for a prosecution of each specific crime. *See Genovese v. Cty. of Suffolk*, No. 10–CV–3470, 2015 WL 5210550, at *3. Under New York law, police officers are not authorized to arrest a suspect for harassment in the second degree unless the violation is witnessed by the officer. *See* N.Y. CRIM.

PROC. LAW § 140.10(1); N.Y. PENAL LAW § 10.00(3), 240.26. By New York statute, if the

alleged violation takes place outside of the officer's presence, there is no probable cause to arrest.

*See Ramos v. City of New York*, 298 Fed. Appx. 84, 86 (2d Cir. 2008). Based upon the fact that

there was no probable cause to arrest pursuant to statute, the Court finds that there was no

arguable probable cause to believe that Plaintiff Penree could successfully be prosecuted pursuant

to that unlawful arrest. *See Boyd*, 336 F.3d at 77.

There is also no arguable probable cause to believe that Plaintiff Penree could be

successfully prosecuted for the remaining criminal charges filed against him because each of

those charges are based upon acts that were taken after Defendants Watson, Skibiniski, and

Ciccone illegally entered into Plaintiff Penree's residence. Without a warrant, without probable

cause, and without exigent circumstances, any evidence of Plaintiff Penree's actions were not

going to be admissible as evidence at any criminal trial. *See id.* Therefore, Defendants are not

entitled to dismissal under qualified immunity.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the

applicable law, and, for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment pursuant to Rule 56 of the

Federal Rules of Civil Procedure (Dkt. No. 37) is **GRANTED in part and DENIED in part**;[10]

and the Court further

---

[10] Those claims that have not been dismissed are as follows: (1) Plaintiff Penree's claim for malicious prosecution under state law and under the Fourth Amendment; (2) Plaintiff D-M.W.'s claim for assault and battery; (3) Plaintiff Penree's claim for excessive force under the Fourth Amendment; (4) Plaintiff D-M.W.'s claim for excessive force under the Fourteenth Amendment; (5) Plaintiff Penree's claim for false arrest under the Fourth Amendment; and (6) Plaintiff Penree's claim for unlawful entry under the Fourth Amendment.

**ORDERS** that Plaintiff Penree's state law claim for false arrest is **DISMISSED**; and the Court further

**ORDERS** that Defendants' motion for summary judgment as to Plaintiff Penree's claim for false arrest pursuant to 42 U.S.C. § 1983 is **DENIED**; and the Court further

**ORDERS** that Plaintiff Penree's state law claims for assault and battery are **DISMISSED**; and the Court further

**ORDERS** that Defendants' motion for summary judgment as to Plaintiff D-M.W.'s claims for assault and battery are **DENIED**; and the Court further

**ORDERS** that Plaintiff Penree's claims for negligence and gross negligence are **DISMISSED**; and the Court further

**ORDERS** that Plaintiff D-M.W.'s claims for negligence and gross negligence are **DISMISSED**; and the Court further

**ORDERS** that Plaintiff Penree's claim for excessive force pursuant to 42. U.S.C. § 1983 against Defendant City of Utica and Defendant Mark Williams is **DISMISSED**; and the Court further

**ORDERS** that Defendants' motion for summary judgment as to Plaintiff Penree's claim for excessive force pursuant to 42 U.S.C. § 1983 related to the use of the Taser CEW against Defendant Watson, Defendant Ciccone, and Defendant Skibinski is **DENIED**; and the Court further

**ORDERS** that Plaintiff Penree's claim for excessive force pursuant to 42 U.S.C. § 1983 related to the use of handcuffs against Defendant Watson, Defendant Ciccone, and Defendant Skibinski is **DISMISSED**; and the Court further

**ORDERS** that Plaintiff D-M.W.'s claim for excessive force pursuant to 42 U.S.C. § 1983 against Defendant City of Utica and Defendant Mark Williams is **DISMISSED**; and the Court further

**ORDERS** that Defendants' motion for summary judgment as to Plaintiff D-M.W.'s claim for excessive force pursuant to 42 U.S.C. § 1983 against Defendant Watson, Defendant Ciccone, and Defendant Skibinski is **DENIED**; and the Court further

**ORDERS** that Plaintiff Penree's and Plaintiff D-M.W.'s claims for failure to train, supervise, or discipline pursuant to 42 U.S.C. § 1983 against Defendant City of Utica and Defendant Mark Williams is **DISMISSED**; and the Court further

**ORDERS** that Defendants' motion for summary judgment as to Plaintiff Penree's claim for unreasonable search pursuant to 42 U.S.C. § 1983 is **DENIED**; and the Court further

**ORDERS** that Defendants' motion for summary judgment as to Plaintiff Penree's claim for malicious prosecution pursuant to 42 U.S.C. § 1983 is **DENIED**; and the Court further

**ORDERS** that Defendants' motion for summary judgment as to Plaintiff Penree's state claim for malicious prosecution is **DENIED**; and the Court further

**ORDERS** that Plaintiffs' claims against Defendant City of Utica Police Department are **DISMISSED**; and the Court further

**ORDERS** that Defendant City of Utica and Defendant Mark Williams are **DISMISSED** from this action; and the Court further

**ORDERS** that Plaintiffs' claims against John Does and Jane Does are **DISMISSED**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: March 4, 2016
  Albany, New York

Mae A. D'Agostino
U.S. District Judge